**INDIANA WHOLESALE WINE & LIQUOR COMPANY, INC., Appellant,**

v.

**STATE of Indiana, ex rel., INDIANA ALCOHOLIC BEVERAGE COMMISSION, and National Wine & Spirits Corporation and Olinger Distributing Company, Inc., Appellees.**

Consolidated No. 49A02–9406–CV–384.

Court of Appeals of Indiana.

Feb. 27, 1996.

Lee B. McTurnan, Wayne C. Turner, Jacqueline B. Ponder, Matthew W. Foster, McTurnan & Turner Indianapolis, for Indiana Wholesale Wine & Liquor Company, Inc.

Pamela Carter, Attorney General, Richard E. Shevitz, Deputy Attorney General, for Indiana Alcoholic Beverage Commission.

Evan E. Steger, Roland A. Fuller, III, Ice Miller Donadio & Ryan, Indianapolis, for National Wine & Spirits Corporation and Olinger Distributing Company, Inc.

William W. Hurst, Michael T. McNelis, Mitchell Hurst Jacobs & Dick, Indianapolis, for Olinger Distributing Company, Inc.

## OPINION

SULLIVAN, Judge.

The State of Indiana, on the relation of the Indiana Alcoholic Beverage Commission

(IABC), commenced this declaratory judgment action on August 7, 1991 naming as defendants Indiana Wholesale Wine and Liquor Company, Inc. (Indiana Wholesale), National Wine and Spirits Corporation (National), and Olinger Distributing Company, Inc. (Olinger).[2] The IABC sought "judicial guidance on the meaning and application of I.C. 7.1–3–21–5, with respect to the Indiana Wholesale Wine & Liquor Company, Inc." Record at 27.

The statute in question (hereinafter "resident ownership requirement") prohibits the issuance of "an alcoholic beverage wholesaler's ... permit of any type to a corporation unless *sixty percent (60%) of the outstanding common stock* is owned by persons who have been continuous and bona fide residents of this state for five (5) years" (emphasis supplied). I.C. 7.1–3–21–5 (Burns Code Ed. Repl.1991). Acknowledging in the complaint that 60 percent of Indiana Wholesale's common stock is owned by Indiana residents, the IABC nonetheless sought judicial resolution as to whether the statutory scheme of Title 7.1 (Alcoholic Beverages) imposed additional organizational requirements with respect to residency.

On August 9, 1991, Indiana Wholesale filed a motion to dismiss National and Olinger as defendants, contending that they had no legally cognizable interest in the outcome. In response, the IABC stated its "desire ... to have all the parties before the Court to argue and represent whatever economic interest they have which may be affected" by the trial court's interpretation of the resident ownership requirement. Record at 87. Subsequently, the IABC filed an Amended Complaint for Declaratory Judgment, which sought guidance as to the meaning and application of the resident ownership requirement not only with respect to Indiana Wholesale, but also with respect to "corporations similarly organized and/or situated". Record at 130. The trial court denied Indiana Wholesale's motion to dismiss National and Olinger.

On December 3, 1992, Indiana Wholesale filed a motion for summary judgment on the construction and constitutionality of the resident ownership requirement. In a supporting brief, Indiana Wholesale argued that the resident ownership requirement was not ambiguous as to the meaning of the phrase "common stock" and that an interpretation requiring 60 percent of the *controlling* stock be owned by Indiana residents would violate the Commerce and Equal Protection Clauses of the United States Constitution and the Equal Privileges Clause of the Indiana Constitution. In response, National and Olinger maintained that the phrase "common stock" as used in the resident ownership requirement meant "controlling stock," and that such a construction was constitutional. The trial court entered summary judgment on March 4, 1994, concluding that the resident ownership requirement was ambiguous and that both the interpretation urged by Indiana Wholesale and the interpretation urged by National and Olinger were reasonable. Because neither the legislative history nor the wording of the statute favored one interpretation over the other, the trial court determined that resolution of the issue should be left to the IABC, which is charged with effecting the state's liquor policy. The trial court declined to decide the effect of the Commerce Clause upon the statute's construction, noting that its resolution of the statutory construction issue "does not turn upon the constitutional issue". Record at 765.

All the parties to the action appealed,[3] presenting the following issues for our review:

(1) Whether National and Olinger were proper defendants in the declaratory judgment action;

---

2. The petition was filed pursuant to I.C. 7.1–2–8–3 (Burns Code Ed.Repl.1991).

3. On April 4, 1994, Indiana Wholesale and the IABC each filed a praecipe. On the same day, National and Olinger filed a Motion to Correct Errors, claiming that the trial court erred by "placing the interpretation of the Statute found by the Court to be ambiguous in the hands of the IABC". Record at 777. The motion was deemed denied pursuant to Ind.Trial Rule 53.3 on May 18, 1994. National and Olinger then filed their praecipe on June 15, 1994. Following briefing, this court consolidated the appeals for purposes of review.

(2) Whether the trial court erred by declining to construe the meaning of the resident ownership requirement or address the constitutional concerns raised by Indiana Wholesale;

(3) Whether the legislature intended the interpretation urged by Indiana Wholesale to apply to the phrase "common stock," or whether the more restrictive "unilateral control" requirement urged by National and Olinger was intended; and

(4) Whether either proffered interpretation of the resident ownership requirement is unconstitutional under the Commerce Clause of the United States Constitution or the Equal Privileges Clause of the Indiana Constitution.

We conclude that National and Olinger were proper parties to be named as defendants in the action for declaratory judgment brought by the IABC pursuant to I.C. 7.1–2–8–3. We also conclude that, under either interpretation of I.C. 7.1–3–21–5, the statute facially discriminates against interstate commerce, and because there has been no showing that the ends purportedly served by the resident ownership requirement could not be achieved through less discriminatory measures, it violates the Commerce Clause of the United States Constitution. Further, notwithstanding the fact that the resident ownership requirement addresses the sale of alcoholic beverages in Indiana, it is not saved from constitutional infirmity by the Twenty-first Amendment. Thus, we do not reach the Equal Privileges claim nor the myriad arguments relating to statutory construction raised by the parties in this vigorously contested case.[4]

## I. Background

The issue of the statute's organizational requirements first arose in a prior case in which permittees National and Olinger unsuccessfully challenged the IABC's decision to grant Marion County wholesale wine and liquor permits to Indiana Wholesale. In *Wine & Spirits Wholesalers of Indiana v. Indiana Alcoholic Beverage Comm'n* (1990) Ind.App., 556 N.E.2d 17, *trans. denied* (First Case), National and Olinger asserted that the term "common stock" in the resident ownership requirement should be interpreted to require that 60 percent of a corporate permittee's *controlling* stock be held by Indiana residents. They contended that Indiana Wholesale's corporate structure violated their proffered interpretation of the resident ownership requirement, because "real control" was possessed by out-of-state residents. Record at 26. The Marion County Superior Court determined that Indiana Wholesale complied with the requirements of the resident ownership requirement, and found that neither National nor Olinger had standing to bring the action.

Upon appeal, a panel of this court affirmed the trial court's decision that National and Olinger lacked standing and thus did not reach the merits of the statutory construction argument.[5] *Wine & Spirits Wholesalers, supra,* 556 N.E.2d at 19. In a footnote to the decision, however, the court noted that the construction of the resident ownership requirement urged by National and Olinger was "credible", and that the corporate structure of Indiana Wholesale would not meet a 60 percent "control" requirement if such a requirement were imposed by the statute. 556 N.E.2d at 19, n. 2.

After the ruling in the First Case, Indiana Wholesale applied for additional permits which would enable it to operate in other locations throughout the state. Believing that the controversy surrounding the term

---

4. National and Olinger also claim that the trial court erred by allowing Indiana Wholesale to file its Ind.Trial Rule 56(C) designation after the summary judgment hearing. Because the "facts" designated by Indiana Wholesale are not determinative in our review of the resident ownership requirement, we need not address this issue.

5. Alternatively, National and Olinger sought judicial review of the administrative issuance of the permit under the Administrative Orders and Procedures Act, I.C. 4–21.5–1–1 et seq. (Burns Code Ed.Repl.1990 & Supp.1995). Upon appeal, the court upheld the trial court's grant of summary judgment, noting that I.C. 4–21.5–3(a)(4) expressly limited standing to those persons who were "aggrieved or adversely affected" by the agency action. *Wine & Spirits Wholesalers, supra,* 556 N.E.2d at 19. National and Olinger failed to meet this standing requirement. *Id.*

"common stock" needed to be resolved in light of Indiana Wholesale's pending applications, the IABC commenced the present action for declaratory judgment.

## II. Standing

Upon appeal, Indiana Wholesale maintains that the trial court erred by refusing to dismiss National and Olinger as defendants. Because National and Olinger lacked standing in the First Case to seek a declaratory judgment, Indiana Wholesale reasons, they also lack standing in this case to be parties to the action. In response, National and Olinger argue that the standing restrictions imposed under the Uniform Declaratory Judgment Act (UDJA) [6] do not apply to an action brought by the IABC pursuant to I.C. 7.1–2–8–3, and, in any event, the UDJA standing requirements do not apply to defendants. We conclude that National and Olinger are proper defendants in this action, and that Indiana Wholesale's reasoning fails to recognize the unique nature of the remedy afforded the IABC under I.C. 7.1–2–8–3.

■ As a threshold matter, we note that the concept of standing differs from the concept of subject matter jurisdiction. *State Dep't of Public Welfare v. Bair* (1984) Ind. App., 463 N.E.2d 1388, 1391. A party has standing if he or she is the proper person to invoke the court's jurisdiction. *National Rural Util. Coop. Fin. Corp. v. Public Serv. Comm'n of Indiana* (1988) Ind.App., 528 N.E.2d 95, 98, *aff'd* Ind., 552 N.E.2d 23. The UDJA grants courts the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." I.C. 34–4–10–1 (Burns Code Ed. Repl.1986). The following persons may invoke the court's jurisdiction under the UDJA:

> "Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declara-

tion of rights, status or other legal relations thereunder." I.C. 34–4–10–2 (Burns Code Ed.Repl.1986)

In the First Case, a panel of this court held that National and Olinger did not have standing to seek a declaratory judgment under the UDJA as to the propriety of Indiana Wholesale's permit because the only "rights, status or legal relationships" they had were in the continued validity of their own permits. *Wine & Spirits Wholesalers, supra,* 556 N.E.2d at 20. These were not altered when the IABC issued a permit to Indiana Wholesale. *Id.* Loss of business, loss of profit, and confusion of the wholesale wine and liquor market in Indiana, although asserted as harm by National and Olinger, are not rights protected by their permits. *Id.*

The present action, however, was brought *by the IABC* pursuant to I.C. 7.1–2–8–3, which provides:

> "The commission shall have the authority also to initiate … an action to obtain a declaratory judgment as to the meaning, application, or constitutionality of a provision of this title or of a rule or regulation of the commission or an order of the commission. The action shall be brought in any court having civil jurisdiction within Marion County against a permittee or other person. The proceedings shall conform to the Indiana Rules of Civil Procedure concerning declaratory judgments."

■ Indiana Wholesale argues that this statute should be read in conjunction with the UDJA jurisdictional and standing requirements articulated in I.C. 34–4–10–1 to – 2. Courts have interpreted these provisions as prohibiting advisory opinions and requiring a litigant seeking declaratory relief to place a "real controversy" before the court. *City of Hammond v. Bd. of Zoning Appeals* (1972) 152 Ind.App. 480, 490, 284 N.E.2d 119, 126. The basis of jurisdiction under the UDJA is "a justiciable controversy or question, which is clearly defined and affects the *legal* rights, the *legal* statuses, or the *legal* relationships of the parties having adverse legal interests." *Indiana Alcoholic Beverage Comm'n v. Deets* (1962) 133 Ind.App. 444,

6. I.C. 34–4–10–1 to –15 (Burns Code Ed.Repl. 1986 & Supp.1995)

449–50, 179 N.E.2d 217, 220, *reh'g denied* (emphasis in original).

■ Before a trial court may determine whether it has subject matter jurisdiction under the UDJA, it must first ascertain whether the *complaining party* has standing and whether the *complaining party* has brought a justiciable issue before the court. *See Bair, supra,* 463 N.E.2d at 1391. Since National and Olinger are not the complaining parties in this case, they are not required under the UDJA to have standing or to present a justiciable issue. However, their interests must be sufficiently adverse to the complaining party in order for jurisdiction to be invoked under the UDJA. *Deets, supra,* 179 N.E.2d at 220.

Applying this requirement to an action for declaratory relief brought against a permittee pursuant to I.C. 7.1–2–8–3 would bar the IABC from naming National and Olinger as defendants. Their legal interests in this action do not differ from their legal interest in the First Case. Because both National and Olinger meet the more strict shareholder unilateral control requirement, the validity of their permits would not be affected by a court order declaring that the resident ownership requirement imposed such an organizational requirement. Nor could the IABC manufacture the requisite controversy by amending its complaint to seek the meaning of the resident ownership requirement as it applies to Indiana Wholesale and to "corporations similarly organized and/or situated". Record at 130. Under this bootstrapping approach, the declaratory judgment action would itself create the controversy which is required to maintain a declaratory judgment action. We reject this circular logic. Even if National and Olinger were similarly situated to Indiana Wholesale, the amended complaint would not make their interests sufficiently adverse to the IABC's for them to be proper defendants under the UDJA.

However, this action was brought pursuant to I.C. 7.1–2–8–3.[7] Both I.C. 7.1–2–8–3 and the UDJA address declaratory judgments. When two acts speak to the same subject, effect should be given to both if possible. *Indiana Alcoholic Beverage Comm'n v. Osco Drug, Inc.* (1982) Ind.App., 431 N.E.2d 823, 833. Where statutes cannot be harmonized or reconciled, the more specific or detailed statute should prevail over the more general statute under principles of statutory construction. *Indiana State Highway Comm'n v. Bates & Rogers Const., Inc.* (1983) Ind. App., 448 N.E.2d 321, 323; *Osco, supra.*

In this case, specific provisions in I.C. 7.1–2–8–3 allow the IABC to bring a declaratory action against a permittee if the meaning, application or constitutionality of a statute, rule, or order is in question. A "permittee" means any "person" who holds a valid alcoholic beverage permit under Title 7.1 of the Indiana Code. I.C. 7.1–1–3–30 (Burns Code Ed.Repl.1991). Thus, by definition, a permittee is a person who has *some* stake in the interpretation and validity of the state alcoholic beverage laws and regulations under which it operates.

The statute also allows the IABC to name an "other person" as a defendant. The definition of "person" in Title 7.1 includes natural individuals, firms, corporations, partnerships, limited partnerships, limited liability companies, and incorporated or unincorporated associations or other legal entities. I.C. 7.1–1–3–31 (Burns Code Ed.Supp.1995). All statutory language is deemed to have been used intentionally and words in a statute are to be treated as surplusage only in the absence of any other possible course. *Brook v. State* (1983) Ind.App., 448 N.E.2d 1249, 1251. If the legislature had not intended to recognize that a permittee has a special interest in the interpretation of alcoholic beverage laws differing from that of other "persons," it could have omitted the word "permittee" and simply used the word "person," because the definition of "person" in Title 7.1 encompasses every type of business association which

---

7. The IABC could not have brought this action pursuant to the UDJA, because as a state commission, it is not the type of entity accorded standing under the statutory scheme. *See* I.C. 34–4–10–13 (Burns Code Ed.Supp.1995), which defines "person" as used in the UDJA as "any person, partnership, limited liability company, joint stock company, unincorporated association, or society, or municipal or other corporation of any character whatsoever."

might receive an alcoholic beverage permit in Indiana.[8]

The clear language of I.C. 7.1–2–8–3 allows the IABC to name as defendants persons who hold valid alcoholic beverage permits, and does not appear to impose any requirement beyond that. Both National and Olinger meet this description, and thus are proper parties. Had the legislature intended otherwise, it could have worded the statute to require the IABC in filing the action against a permittee to conform to UDJA standing requirements for "persons" or to allow only "affected" permittees to be named as defendants. This was somewhat the course followed by the legislature in adopting I.C. 22–8–1.1–19 (Burns Code Ed.Repl.1992), which, with regard to permissible plaintiffs in a particular declaratory judgment scenario, provides:

> "After promulgation of a safety standard by the [Occupational Safety Standards Commission], any question as to its applicability or legal validity may be adjudicated by an action for a declaratory judgment filed by an affected person or firm,[9] pursuant to the provisions of [the UDJA]."

Instead, the legislature required in I.C. 7.1–2–8–3 that all declaratory judgment proceedings initiated by the IABC "conform to the Indiana Rules of Civil Procedure concerning declaratory judgments." Indiana Wholesale maintains that this language indicates a legislative intent that actions filed under I.C. 7.1–2–8–3 conform to all of the UDJA's requirements because the statute "directs use of the principal procedural counterpart to the Uniform Act, Ind.Trial Rule 57." Brief of Appellant (Indiana Wholesale) at 46. However, this rule and the UDJA do not govern the same aspects of declaratory

judgment proceedings. *Sendak v. Debro* (1976) 264 Ind. 323, 329, 343 N.E.2d 779, 782.

We are aware that this opens a door to National and Olinger to challenge Indiana Wholesale's permits which the court in the First Case said was closed by the clear language of the UDJA. Although it is seemingly unfair to allow permittees into the courtroom through the back door to argue the invalidity of a competitor's permits, it would also be absurd to keep them outside and thus have the court hear only one proffered construction of an ambiguous statute.

The Indiana Constitution has no "case or controversy" requirement; however, our explicit separation of powers clause fulfills a similar function. *Pence v. State* (1995) Ind., 652 N.E.2d 486, 488, *reh'g denied; Indiana Dep't of Envtl. Management v. Chemical Waste Management, Inc.* (1994) Ind., 643 N.E.2d 331, 336–337. The various superior courts are created by the legislature and thus have only such jurisdiction as is granted by statute. *Benham v. State* (1994) Ind., 637 N.E.2d 133, 136. Within the context of the UDJA, judicial power may only be invoked if the plaintiff *and the defendant* have a sufficient and adequately conflicting legal interest with a concrete factual basis to justify the rendering of a declaratory judgment. *City of Hammond, supra,* 284 N.E.2d at 126.

The legislature, however, appeared to contemplate a different scenario in granting the IABC the unique authority to "obtain a declaratory judgment as to the meaning, application, or constitutionality of a provision of this title or of a rule or regulation of the commission or an order of the commission" and to name a permittee as defendant. I.C. 7.1–2–8–3.[10] *See, e.g., Beer Distrib. of Indiana v. State ex rel. Alcoholic Beverage Comm'n* (1982) Ind.App., 431 N.E.2d 836

---

8. Conversely, the general word "person" as used in I.C. 7.1–2–8–3, when read in harmony with the UDJA, would appear to impose some limitations on the ability of the IABC to bring declaratory judgment actions against non-permit holders, although we are not called upon to address those limitations today.

9. In this case, the word "firm" is not surplusage, because "firms" are not among the enumerated entities defined as "persons" in the UDJA. I.C. 34–4–10–13.

10. Whether or not it is wise public policy to have two categories of declaratory judgment actions is not for us to say. The fact remains that the General Assembly has created one such action for ordinary civil litigants. That category is tested by the requirements of the UDJA. Another category has been created for the IABC and is not tested by the normal requirements.

(IABC sought declaratory judgment as to whether the statutory scheme allowed certain wholesalers to import Coors beer after the commission deadlocked on the issue).[11] Presumably, the IABC would not ask the court to rule upon the meaning of an alcoholic beverage statute, rule or order unless the meaning was uncertain and a permittee's rights were in question. Indeed, such resort to judicial process would prove fruitless if the language was clear on its face. Only when a statute is ambiguous is it subject to judicial interpretation. *One 1968 Buick, Four Door v. State* (1994) Ind.App., 638 N.E.2d 1313, 1316; *Joseph v. Lake Ridge Sch. Corp.* (1991) Ind.App., 580 N.E.2d 316, 319, *trans. denied.* If we read I.C. 7.1–2–8–3 to bar the IABC from naming National and Olinger as defendants, however, only one interpretation of an ambiguous statute or regulation would be argued by a party before the court. This could not have been the intention of the legislature in providing the IABC this unique remedy.

The doctrine of standing exists to "insure that litigation will be actively and vigorously contested". *Indiana Educ. Employment Relations Bd. v. Benton Community Sch.* (1977) 266 Ind. 491, 496, 365 N.E.2d 752, 754. Under the unique form of declaratory relief provided to the IABC by statute, the only way that litigation will be actively and vigorously contested is if the IABC is permitted to join permittees with differing viewpoints with respect to the construction of a statute or regulation affecting the alcoholic beverage industry. To superimpose additional requirements on the parties would frustrate the intent of the legislature in providing a judicial forum for resolution of disputed language in alcoholic beverage laws and rules.

## III. Disposition in the Trial Court

Both the meaning and constitutionality of the resident ownership requirement are issues which the trial court should have decided, and they are properly before this court upon appeal. Although courts will not interpret a statute which is clear and unambiguous on its face, *Matter of Grissom* (1992) Ind., 587 N.E.2d 114, 116, the trial court here concluded that the statute was ambiguous. Given this conclusion, it was error to then return to the IABC the task of resolving the ambiguity as a matter of "policy determination." Record at 765.

Indiana Code 7.1–2–8–3 grants the IABC the authority to go to the courts to resolve statutory construction issues regarding alcoholic beverage laws. This authority would be eviscerated if upon a finding of ambiguity, the trial court could then order the agency to perform the task of statutory construction which the agency had, in the first instance, been empowered by statute to ask of the trial court.

In addition, although the IABC did not ask the trial court for a determination of the constitutionality of the resident ownership requirement, the issue of whether the unilateral control requirement urged by National and Olinger violated the state and federal constitutions was presented by Indiana Wholesale in its motion for summary judgment. The summary judgment order granted the IABC the latitude to accept either interpretation. Upon appeal, the IABC has acknowledged that *both* proffered interpretations are subject to the same constitutional concerns. Brief of Appellee (IABC) at 9. Thus, regardless of which interpretation the IABC ultimately selected, it would have been

---

11. We note that in addition to allowing the IABC to seek a declaratory judgment regarding a statute enacted by the legislature, I.C. 7.1–2–8–3 also allows the IABC to seek a declaratory judgment regarding an order which it drafted or a rule which it promulgated. In construing a statute, we will not question the wisdom of legislative enactments nor substitute our opinion for the legislature's viewpoint. *Daugherty v. State* (1984) Ind.App., 466 N.E.2d 46, 52, *reh'g denied.* However, as the appellate court noted in *City of Mishawaka v. Mohney* (1973) 156 Ind.App. 668, 674, 297 N.E.2d 858, 861, *reh'g denied,* "[F]or a municipality to enact ordinances and forthwith

implore a court to rule upon their validity appears, at best, incongruous. To construe the Uniform Declaratory Judgment Act as according such a right of action to a governmental body would foster legislative irresponsibility". 297 N.E.2d at 861. A similar rationale exists for imposing limitations on the IABC's authority under I.C. 7.1–2–8–3 to initiate actions to obtain declaratory judgments on the meaning or constitutionality of its own rules or orders. Because in this case the IABC sought determination of an ambiguous statute, the issue with respect to administrative rules or orders must await another day.

required to engage in a constitutional analysis. The constitutionality of a statute is a purely legal question beyond the expertise of an administrative board. *State ex rel. Basham v. Medical Licensing Bd. of Indiana* (1983) Ind.App., 451 N.E.2d 691, 696. "It is not within the province of an administrative officer to pass on the [constitutional] validity of a statute." *Sunshine Promotions Inc. v. Ridlen* (1985) Ind.App., 483 N.E.2d 761, 765. We therefore conclude that the trial court should have construed the meaning and determined the constitutionality of the statute.

Where, as here, the question presented is one of law, we stand in as good a position as the trial court to resolve the question, and review the trial court's decision *de novo*. *City of Wabash v. Wabash County Sheriff's Dep't* (1990) Ind.App., 562 N.E.2d 1299, 1300. Thus, because we conclude that the proper resolution of this case lies with consideration of the constitutional questions, we proceed with our constitutional analysis.[12]

### IV. Commerce Clause

■ Turning to the Commerce Clause issue, we first consider the language of the clause itself, which states: "The Congress shall have Power ... [t]o regulate Commerce ... among the several States".[13] It is well understood that this language, though expressed as an affirmative grant of power to Congress, "also directly limits the power of the States to discriminate against interstate commerce" even where the Congress has not exercised its regulatory power. *Wyoming v. Oklahoma* (1994) 502 U.S. 437, 454, 112 S.Ct. 789, 800, 117 L.Ed.2d 1. This "negative" or "dormant" feature of the Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors." *Id.* (quoting *New Energy Co. of Indiana v. Limbach* (1988) 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302). At issue here is the impact of the "negative". Commerce Clause upon Indiana's in-state resident ownership requirement for liquor wholesalers.[14]

■ The United States Supreme Court has developed a "two-tiered" test for evaluating claims under the "negative" Commerce Clause. *Brown–Forman Distillers v. New York State Liquor Auth.* (1986) 476 U.S. 573, 578, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552. When a law "has only incidental effects on interstate commerce and regulates evenhandedly," 476 U.S. at 579, 106 S.Ct. at 2084, the Court upholds the law "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits", *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174. However, where a law facially

---

**12.** We pause only briefly before addressing the merits of the constitutional issues to reject Indiana Wholesale's contention that we should adopt its interpretation of the resident ownership requirement, on the grounds that by doing so, we avoid addressing constitutional issue unnecessarily. *See Bureau of Motor Vehicles v. Scott* (1986) Ind., 497 N.E.2d 557, 559. We concur with National and Olinger's contention that "[e]ven a cursory examination of Indiana Wholesale's constitutional challenge reveals Indiana Wholesale's interpretation of the [resident ownership requirement] suffers from the same infirmities which Indiana Wholesale contends renders unconstitutional the ... interpretation urged by National and Olinger. Thus, the rule of statutory construction that a court should adopt a constitutional interpretation of a statute, over an unconstitutional one, has no application here." Br. of Appellees (National and Olinger) at 13. The IABC as well appears to concur that the constitutional issues raised here have at least "indirect" application to Indiana Wholesale's proffered interpretation. Br. of Appellee (IABC) at 9. We note that Indiana Wholesale does not assert that its interpretation is in fact constitutional, but only argues that National and Olinger's failure to challenge the constitutionality of Indiana Wholesale's interpretation, somehow precludes us from determining the resident ownership requirement's constitutionality under Indiana Wholesale's interpretation. We will not be hamstrung by this argument in our effort to fully dispose of the constitutional issues presented in this appeal, however, as we agree with the IABC that "such issues are central to the complete resolution of this matter." *Id.* at 10; *see* Ind.Appellate Rule 15(N) (appellate court has power to grant appropriate relief, including ordering that final judgment be entered).

**13.** U.S. Const., art. I, § 8, cl. 3.

**14.** National and Olinger also argue that, pursuant to its power under the "positive" Commerce Clause, Congress immunized Indiana's in-state resident ownership requirement from challenge with the passage of the Webb–Kenyon Act. We will address National and Olinger's argument on this issue *infra* n. 38.

discriminates against interstate commerce, the burden rests with the law's proponents to show both that the law serves a valid purpose unrelated to economic protectionism, and that no alternative nondiscriminatory means exist to further the purpose. *Wyoming v. Oklahoma, supra,* 502 U.S. at 454, 112 S.Ct. at 800; *Hughes v. Oklahoma* (1979) 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250. Under this "strict scrutiny" approach, the Court has erected a "virtual *per se* rule of invalidity" of facially discriminatory laws. *City of Philadelphia v. New Jersey* (1978) 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (emphasis in original). Further, the Court has noted that a facially discriminatory law is subject to the "strict scrutiny" approach regardless of whether it is in fact motivated by a protectionist aim, because "the evil of protectionism can reside in legislative means as well as legislative ends." 437 U.S. at 626, 98 S.Ct. at 2536–37.

■ Judging by this standard, we have no difficulty in first concluding that I.C. 7.1–3–21–5 is subject to "strict scrutiny" under the Commerce Clause. The law clearly states that *only* those corporations in which five-year Indiana residents own 60 percent or more of the "common stock" are eligible for wholesale alcoholic beverage permits. The Supreme Court recently stated that " 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter", *Oregon Waste Systems v. Dep't of Envtl. Quality* (1994) 511 U.S. 93, ——, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13, and there can be no doubt that the statute affords "differential treatment" to corporations with an out-of-state ownership percentage above 60 percent—it flatly denies them access to Indiana's wholesale alcoholic beverage market based solely on the fact of their out-of-state ownership. Conversely, the statute reserves the permits (and thus, the "benefit" of access to the wholesale alcoholic beverage market) for those corporations which meet Indiana's resident ownership requirement. This is precisely the sort of discrimi-

nation which triggers "strict scrutiny" under the Commerce Clause. *See Cooper v. McBeath* (1994) 5th Cir., 11 F.3d 547, 553 (Texas statute prohibiting issuance of alcoholic beverage permit to corporations with less than 51 percent in-state ownership constitutes an "impenetrable barrier to entering the Texas liquor industry on substantially equal terms as Texans enjoy", thus necessitating strict scrutiny under the Commerce Clause), *cert. denied* —— U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810; *cf. Department of Revenue v. There to Care, Inc.* (1994) Ind. App., 638 N.E.2d 871, 873–74 (Indiana's Charity Gaming Act would trigger strict scrutiny under Commerce Clause if interpreted to require charity to have been in operation *in Indiana* for five years, as it would "affirmatively discriminate" against interstate commerce), *trans. denied.*

Further, it is irrelevant to our conclusion that the "meaningful participation" interpretation offered by Indiana Wholesale may be somewhat less discriminatory than the "unilateral control" interpretation offered by National and Olinger. *See Wyoming v. Oklahoma, supra,* 502 U.S. at 455, 112 S.Ct. at 801 ("The volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce.") (emphasis in original). Whether we construe the statute to require "unilateral control" or "meaningful participation" is irrelevant, for the *facial* discrimination, and thus the trigger of strict scrutiny, lies in the fact of the ownership requirement itself, irrespective of whether it means that Indiana residents must have "unilateral control" of or "meaningful participation" in the corporation.[15]

Because I.C. 7.1–3–21–5 is facially discriminatory, we examine with the "strictest scrutiny" the purported nondiscriminatory purposes of the law, and whether there are no less discriminatory means to achieve those ends. *Hughes v. Oklahoma, supra,* 441 U.S. at 337, 99 S.Ct. at 1737. In doing so, we

---

**15.** At oral argument, all parties (including the IABC) agreed that the phrase "common stock" as used in I.C. 7.1–3–21–5 necessarily implies "some" level of control over the corporation's affairs. On appeal, Indiana Wholesale asserts that I.C. 7.1–3–21–5 requires "meaningful participation" by those holding common stock in the permittee corporation.

keep in mind that the burden upon the law's proponents "is so heavy that 'facial discrimination by itself may be a fatal defect.' " *Oregon Waste Systems, supra,* 511 U.S. at ——, 114 S.Ct. at 1351 (quoting *Hughes v. Oklahoma, supra,* 441 U.S. at 337, 99 S.Ct. at 1737). Under this rigorous standard, the statute cannot stand, for it has not been demonstrated that the purported aims of the statute, even if they are legitimate, may not be served by less discriminatory alternatives.[16]

■ We first consider I.C. 7.1–1–1–1, which lists the "general purposes" of the State's regime for regulation of liquor:

"(a) To protect the economic welfare, health, peace and morals of the people of this state;

(b) To regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages; and

(c) To provide for the raising of revenue." I.C. 7.1–1–1–1 (Burns Code Ed.Repl.1991).

In *Cooper v. McBeath, supra,* 11 F.3d 547, the United States Court of Appeals for the Fifth Circuit addressed a Texas requirement that 51 percent of the stock of a corporate alcoholic beverage licensee be owned by Texans. In that case, Texas sought to justify its requirement with similar "general" goals of the State's regime for regulation of alcoholic beverages. 11 F.3d at 554. We agree with the *McBeath* court that "boilerplate" language such as this does not begin to explain the "particular restrictions on out-of-state ownership of various liquor licenses." *Id.* Fortunately, National and Olinger offer two justifications for the resident ownership requirement which far more clearly articulate the specific interests purportedly served by the requirement. First, the requirement allegedly allows Indiana "to properly ensure

that permit holders are qualified to hold the permits"[17]; and second, the requirement serves "to make Indiana residents accountable for ensuring that permit holders comply with Indiana's alcohol laws and regulations". Brief of Appellees (National and Olinger) at 15.

As to the "qualification" rationale, we again register our agreement with the *McBeath* court that this rationale provides insufficient support for the resident ownership requirement. As support for the constitutionality of Indiana's resident ownership requirement, National and Olinger cite Judge Sharp's opinion in *Coolman v. Robinson* (1978) N.D.Ind., 452 F.Supp. 1324, which upheld, over an equal protection challenge, a similar residency requirement imposed upon an individual seeking a liquor permit for his restaurant. *Coolman,* however, is inapposite for the simple reasons that it did not address the Commerce Clause at all, and utilized only "rational basis" scrutiny in considering the equal protection claim, having concluded that the "right to travel" on which plaintiff's equal protection claim was based was "not so basic or fundamental as to require the State of Indiana to meet the compelling state interest test." 452 F.Supp. at 1328. Thus, because there is no doubt that a "strict scrutiny" standard is to be employed here, the only relevant insight *Coolman* offers us pertains to the general subject of whether Indiana has even a "legitimate" interest in investigating the backgrounds of those seeking alcoholic beverage permits.

We do not question the legitimacy of Indiana's interest in ensuring that alcoholic beverage permit holders are properly "qualified" to hold those permits. However, the *McBeath* court, in striking down Texas' requirement that only corporations with 51 percent in-state ownership could receive li-

---

**16.** We note that, given the somewhat unusual procedural posture of this case, it has been National and Olinger, as opposed to the IABC, which have most vigorously defended the law's constitutionality. While one might have concern that the IABC, as the agency charged with the statute's enforcement, would be better able to defend the law's constitutionality, the IABC filed a brief in this appeal in which it specifically adopted National and Olinger's arguments on the constitutional issue, and declined to raise addi-

tional arguments. Thus, we evaluate the constitutional arguments in this case confident that the justifications on the law's behalf that the IABC would raise itself would have been raised.

**17.** The "qualification" rationale is premised in large measure upon the limitation of permits to applicants who are "of good moral character and of good repute". Ind.Admin.Code tit. 905, r. 1–27–1 (1992).

quor licenses, discussed fully and persuasively why a blanket prohibition on out-of-state corporate ownership cannot be sustained under rigorous Commerce Clause scrutiny:

> "As their practical justification for the ... in-state residency requirement, [Texas] assert[s] that the [Texas Alcoholic Beverage] Commission's approval of alcoholic beverage permits is based on an intensely local screening of each applicant's reputation in the community plus a complete, thorough business and financial investigation performed by TABC. Further, the Commission's ability to investigate an out-of-state applicant's reputation and qualifications is severely limited. *But however legitimate may be the State's ultimate goals, it cannot pursue them via the illegitimate means of a flat proscription of non-Texans.* (citing *City of Philadelphia, supra,* 437 U.S. at 626–27, 98 S.Ct. at 2537).
>
> ... If Texas desires to scrutinize its applicants thoroughly, as is its right, it can devise non-discriminatory means short of saddling applicants with the 'burden' of residing in Texas. [footnote omitted] Nonresident liquor license applicants may be required to furnish whatever information the State deems necessary, together with a release to permit rigorous verification checks.... The entity's employees or supervisors can, of course, be criminally prosecuted regardless where they reside." 11 F.3d at 554 (emphasis supplied).

With respect to the issue of background checks as a rationale for in-state resident ownership requirements, we find the *McBeath* court's treatment persuasive, and conclude that Indiana's 60 percent in-state resident ownership requirement is not justified by the State's interest in investigating

the background or qualifications of permit applicants.[18]

As to the issue of ensuring compliance with Indiana laws, there are in effect two components to this argument: first, the assertion that "residents of Indiana are much more readily subject to the arrest and subpoena power of the state than those who reside outside of Indiana", Brief of Appellees (National and Olinger) at 17; and second, the assertion that, because of the "unique" role of wholesalers in Indiana's liquor distribution system, whereby the IABC relies, as a practical matter, upon wholesalers to collect excise taxes from retailers, ensure that retailers have necessary permits, and enforce the prohibition against sales on credit,[19] the ability to subject wholesalers to Indiana's police power is a "key element" of the State's regulatory regime. *Id.* at 18. As with the State's asserted interest in checking the backgrounds of its wholesale alcoholic beverage permit applicants, we need not question the legitimacy of these asserted interests, because again the means employed by Indiana to further those ends do not pass Commerce Clause muster.[20]

We first note that the *McBeath* rationale cited earlier undermines as well the argument that an in-state resident ownership requirement can serve as a "proxy" requirement for ensuring compliance with applicable state law. "[A] holder-corporation [of a liquor permit] that violates the State's laws faces revocation of its permit ... and other civil and criminal penalties. The [permittee's] employees or supervisors can, of course, be criminally prosecuted regardless of where they reside." 11 F.3d at 554. However, there is a more fundamental flaw with Indiana's resident ownership requirement; it simply does not appear to target those likely, as a practical matter, to be

---

**18.** We note in passing that, in *Coolman,* Judge Sharp opined that, even under the rational basis test used in that case, "the plaintiff would have a much stronger case were the challenged statute unaffected by the Twenty-first Amendment." 452 F.Supp. at 1330. The court determined that the Twenty-first Amendment conferred a degree of legitimacy upon the residency requirement.

**19.** *See* I.C. 7.1–5–10–12 (Burns Code Ed.Repl. 1991).

**20.** We are, however, somewhat skeptical about the legitimacy of the argument that the IABC can abdicate certain of its regulatory responsibilities to wholesale permittees, then use the permittees' responsibility for undertaking those regulatory duties to justify a "heightened" interest in maintaining control over those permittees' ownership structure.

sufficiently involved with the day-to-day activities of the wholesaler to ensure that the purported objectives are in fact advanced.

Indiana's resident ownership requirement pertains, by its terms, *only* to the residency of the shareholders of a licensee corporation. Conversely, the residency of those with actual operational control over a corporation—the board of directors and officers—is unregulated by the requirement. Though the basic structure of a corporation is well-known, it is aptly summarized by Professor Galanti in 17 *Indiana Practice* (Business Organizations) § 9.3:

> "[T]he corporation is managed · by the board of directors who are elected by the shareholders. Otherwise, the role of shareholders in management is limited to removing directors from office, under certain circumstances, and to approving extraordinary matters. [footnote omitted] The directors in turn appoint and remove officers who execute the policy decisions of the directors and administer corporate affairs." § 9.3, pp. 500–501.

This would seem to suggest that concern with ensuring compliance with Indiana laws and execution of the wholesalers' "unique" role within Indiana's liquor distribution system, would be better served by directing the restrictions toward those who are more likely to actually be involved with and execute the day-to-day operations of a licensed wholesaler. Even if the shareholders of some corporate permittees might exercise more direct control over some day-to-day business operations, *see* I.C. 23–1–33–1(c) (Burns Code Ed. Repl.1995) (corporation with fifty or fewer shareholders may "dispense" with board of directors under some circumstances), it is of no aid to the resident ownership requirement, which by its terms applies to the shareholder structure of *any* permittee, no matter how passive its shareholders might be.

We need not, however, speculate about specifics pertaining to the relation between

day-to-day operations and overall shareholder authority to reach our conclusion under the "strict scrutiny" standard, that it absolutely has not been demonstrated that a majority in-state resident ownership requirement is the "least restrictive means" the Indiana legislature could use to achieve its ends of ensuring compliance with Indiana laws. When a state imposes a facially discriminatory resident ownership requirement on licensed corporations, the interstate commerce chiefly affected is investment. *See Gulch Gaming, Inc. v. South Dakota* (1991) D.S.D., 781 F.Supp. 621, 626. Indiana's resident ownership requirement, by categorically restricting out-of-state investment in corporate wholesalers, while ignoring management-level employees, is thus at best a "blunderbuss" effort at achieving the putative goals advocated before us, in that it targets for restriction the level of corporate structure in which the "stream" of interstate commerce flows most heavily. *Cf. Pike v. Bruce Church, supra,* 397 U.S. at 145, 90 S.Ct. at 849 ("[T]he Court has viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere. Even where the State is pursuing a clearly legitimate local interest, this particular burden on commerce has been declared to be virtually *per se* illegal.") (emphasis in original). Given the unlikely (or at least undemonstrated) nexus between the residency of a corporation's shareholders and the IABC's enhanced ability to ensure compliance with Indiana law, as well as the resident ownership requirement's broadside impact upon interstate commerce, we are not at all convinced that such a resident ownership requirement is the "least restrictive means" of advancing the State's purported interests related to compliance with Indiana law. Indeed, it has not been demonstrated to us that the resident ownership requirement advances that interest *at all.* Thus, we conclude that Indiana's in-state resident ownership requirement violates the Commerce Clause.[21]

**21.** While further elaboration is not necessary to our conclusion, we do note that the IABC has extensive authority to investigate and regulate the activities of its permittees notwithstanding the residency of the permittee's shareholders.

Indiana Code 7.1–3–1–6 (Burns Code Ed.Repl. 1991) provides that a permittee must expressly "consent[] for the duration of the permit term ... to the entrance, inspection, and search by an enforcement officer, without a warrant or other

As with our conclusion concerning the level of scrutiny to be applied, our conclusion that the resident ownership requirement violates the Commerce Clause would apply equally whether we adopted National and Olinger's or Indiana Wholesale's construction of the requirement. Indeed, to the extent that the statute's justifications rely upon an assumption of the nexus between shareholder control over the day-to-day operation of a corporate permittee and compliance with Indiana law, the resident ownership requirement serves that end even less well under Indiana Wholesale's interpretation than under National and Olinger's, because the level of control Indiana shareholders would necessarily exercise under Indiana Wholesale's interpretation is somewhat less than under National and Olinger's. Further, it is irrelevant that the requirement might impose marginally less of a burden on interstate commerce under Indiana Wholesale's interpretation than under National and Olinger's, since there is no showing under either interpretation that a shareholder resident ownership requirement is the "least restrictive means" of achieving the regulatory ends. Indiana's in-state resident ownership requirement runs afoul of the Commerce Clause under either of the interpretations offered.[22]

## V.  Twenty-first Amendment

█ Our conclusion that Indiana's resident ownership requirement is violative of the Commerce Clause does not, of course, end our inquiry, for the Twenty-first Amendment[23] "reserves to the States power to impose burdens on interstate commerce in intoxicating liquor that, absent the Amendment, would clearly be invalid under the Commerce Clause." *Capital Cities Cable, Inc. v. Crisp* (1984), 467 U.S. 691, 712, 104 S.Ct. 2694, 2707, 81 L.Ed.2d 580. However, "[b]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution [and] each must be considered in light of the other and in the context of the issues and interests at stake in any concrete case.'" *Bacchus Imports, Ltd. v. Dias* (1984) 468 U.S. 263, 275, 104 S.Ct. 3049, 3057, 82 L.Ed.2d 200 (quoting *Hostetter v. Idlewild Bon Voyage Liquor Corp.* (1964)

---

process, of his licensed premises and vehicles" to ensure compliance with Indiana's regulatory scheme. Further, I.C. 7.1–2–3–19 gives the IABC power to "'(a) Prescribe the manner and methods by which all records relating to alcoholic beverages are kept and preserved; (b) Inspect all records relating to alcoholic beverages; and (c) Require true copies of any record to be made and furnished to the [IABC].'" Penalty for refusal to allow the IABC to conduct its examination is revocation of the permit. I.C. 7.1–3–23–14.

This demonstrates that there are means, unrelated to residency of the permittee's shareholders, which are available to the IABC to ensure compliance with Indiana's regulatory provisions. Our quarrel is not with the idea that the IABC has broad authority to regulate wholesale alcoholic beverage permittees; it is with the unsubstantiated assertion that a majority in-state resident ownership requirement serves as the least restrictive means of advancing Indiana's regulatory objectives.

22.  We deem it appropriate to make explicit our implicit resolution of a methodological issue. National and Olinger argue that the *McBeath* court erred in analyzing a Texas resident ownership requirement similar to the one at issue by "analyz[ing] the issue using a conventional Commerce Clause analysis, only turning to the Twenty-first Amendment after it determined that the Texas statute violated the Commerce Clause."

Br. of Appellees (National and Olinger) at 21. Indiana Wholesale counters that, by phrasing the justifications for Indiana's resident ownership requirement in terms of the requirement's relation to alcoholic beverages, National and Olinger in effect "concede" that the statute (at least as construed by National and Olinger) could not "withstand a straightforward Commerce Clause analysis". Reply Br. of Appellant (Indiana Wholesale) at 18.

While, as hereinafter set forth, we do not adopt the *McBeath* court's substantive reasoning with respect to its Twenty-first Amendment analysis, we do agree with its methodological approach. If the operation of the Twenty-first Amendment is to "save" state regulation otherwise invalid under the "negative" Commerce Clause, *see Bacchus Imports, Ltd. v. Dias* (1984) 468 U.S. 263, 274, 104 S.Ct. 3049, 3056, 82 L.Ed.2d 200, one must *a fortiori* conclude that the state regulation is constitutionally infirm before considering the extent to which the Twenty-first Amendment "saves" the regulation from invalidity. This is the approach used by the Supreme Court in *Bacchus*, and we follow that approach here. However, as the foregoing analysis demonstrates, we have not equated National and Olinger's position with a "concession" upon the Commerce Clause issue.

23.  U.S. Const., amend. XXI, § 2.

377 U.S. 324, 332, 84 S.Ct. 1293, 1298, 12 L.Ed.2d 350).[24]

## A. *Appropriate Standard of Scrutiny*

Under the Supreme Court's jurisprudence to date, it is unclear at first glance what approach a court is to take in determining precisely when a statute regulating liquor repugnant to the "negative" Commerce Clause is "saved" by the Twenty-first Amendment. With respect to "positive" Commerce Clause cases, where a state statute interferes with "expressed" federal policies, the Supreme Court has examined the interest of the State, scrutinizing the extent to which the statute at issue actually serves that interest, and has balanced that interest against the expressed federal policy. This appears to usually have resulted in invalidation of the state regulation. *See Capital Cities, supra,* 467 U.S. at 713–16, 104 S.Ct. at 2707–09; *California Retail Liquor Dealers Ass'n v. Midcal Alum.* (1980) 445 U.S. 97, 109–114, 100 S.Ct. 937, 945–48, 63 L.Ed.2d 233.

In "negative" Commerce Clause cases, however, the standard of scrutiny a court is to apply is not so clear. It is apparent that, unlike the "positive" Commerce Clause cases, there is not an "expressed" federal interest to weigh against the state's interest, save the "strong federal interests in preventing economic Balkanization" that the Commerce Clause itself has been interpreted to encompass. *Bacchus, supra,* 468 U.S. at 276, 104 S.Ct. at 3058.

In *Bacchus,* the Supreme Court addressed the interplay between the "negative" Commerce Clause and the Twenty-first Amendment in striking down a 20 percent excise tax imposed by Hawaii on all liquor *except* "certain locally-produced beverages." 468 U.S. at 265, 104 S.Ct. at 3052. Hawaii conceded that the purpose of the tax was to subsidize a local fruit-wine industry. 468 U.S. at 272, 104 S.Ct. at 3056. In that case, rather than engaging in a balancing of state and "expressed" federal interests, the Court looked to the state's purpose of "favor[ing] local liquor industries by erecting barriers to competition", and concluded that, "[d]oubts about the scope of the [Twenty-first] Amendment's authorization notwithstanding", this objective did not fall within the "central purpose" of the Amendment. 468 U.S. at 276, 104 S.Ct. at 3058.[25]

■ The case at bar, however, is somewhat unlike *Bacchus,* in that the State has proffered justifications for the statute unrelated to economic protectionism or the development of local industry. Unlike non-liquor Commerce Clause cases, in which facially discriminatory laws are subject to strict scrutiny irrespective of the "purpose" of the legislation, *e.g., City of Philadelphia, supra,* 437 U.S. at 626, 98 S.Ct. at 2536–37, the Court has recognized that even facially discriminatory laws aimed at furthering the "core concerns" of the Twenty-first Amendment are entitled to some level of "deference". *See Bacchus, supra,* 468 U.S. at 276, 104 S.Ct. at 3058; *see also North Dakota v. United States* (1990) 495 U.S. 423, 433, 110 S.Ct. 1986, 1994,

**24.** A lengthy tracing of the United States Supreme Court's jurisprudence concerning the Twenty-first Amendment's protections of otherwise invalid state regulation is not necessary here. Suffice it to say that, whereas the Court's early cases evince a belief that the power of States with respect to liquor regulation was virtually absolute, "with the flow of history, just as the beer of yesteryear has lost its strength and flavor, the broad language of [early Supreme Court decisions embracing an expansive view of the Twenty-first Amendment] has been diluted in subsequent decisions by the Court." *Loretto Winery v. Gazzara* (1985) S.D.N.Y., 601 F.Supp. 850, 860, *aff'd as modified* 2d Cir., 761 F.2d 140.

**25.** We acknowledge the Court's recitation in *Bacchus* of the "balancing" test employed in *Capital Cities* and *Midcal,* both "positive" Commerce Clause cases. 468 U.S. at 275–76, 104 S.Ct. at 3057. Nonetheless, as we read *Bacchus,* we do not discern that any "balancing" was in fact performed. It appears that the tax in *Bacchus* was struck down, not because the state's interest was "outweighed" by the federal interest, but because the state's interest—concededly economic protectionism—took its statute out of the protective ambit of the Twenty-first Amendment entirely. 468 U.S. at 276, 104 S.Ct. at 3058. The Court in *Bacchus* phrased the test as whether the "principles underlying the Twenty-first Amendment" were "sufficiently implicated" so as to "outweigh" the Commerce Clause interest. 468 U.S. at 275, 104 S.Ct. at 3057. We read *Bacchus* as a case in which the "principles" of the Twenty-first Amendment were not implicated at all, because of the concededly discriminatory purpose behind the tax.

109 L.Ed.2d 420 ("Given the special protection afforded to state liquor control policies by the Twenty-first Amendment, they are supported by a strong presumption of validity and should not be set aside lightly."). Thus, *Bacchus* appears not to have expressly decided the question of what standard a court should use when evaluating a statute which on its face discriminates against interstate commerce, and thus is subject to strict scrutiny (and likely invalidation) under the Commerce Clause, but which can be justified by its advancement of the "core concerns" of the Twenty-first Amendment. It would seen unlikely that a "strict scrutiny" approach analogous to that used in regular Commerce Clause cases would be appropriate, since to scrutinize state regulation of liquor that furthers the "core concerns" of the Twenty-first Amendment under a strict scrutiny approach, would have the effect of seriously undermining the Twenty-first Amendment's special protection of state liquor regulation. *See Midcal, supra,* 445 U.S. at 110, 100 S.Ct. at 946 ("The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system."); *see also Bacchus, supra,* 468 U.S. at 276, 104 S.Ct. at 3058 (facially discriminatory tax struck down "because the tax violates a central tenet of the Commerce Clause *but is not supported by any clear concern of the Twenty-first Amendment* ") (emphasis supplied).[26]

■ Exactly what interests constitute the "core concerns" of the Twenty-first Amend-

ment is, unfortunately, not easily discernible. The Court has recognized that, given the "obscurity" of the Amendment's legislative history, "[n]o clear consensus concerning the meaning of [the Twenty-first Amendment] is apparent." *Bacchus, supra,* 468 U.S. at 274, 104 S.Ct. at 3057. What is clear is that preservation of the states' ability to promote temperance, is undoubtedly one of the "core concerns" of the Twenty-first Amendment. *See Bacchus, supra,* 468 U.S. at 276, 104 S.Ct. at 3058; *see also North Dakota, supra,* 495 U.S. at 432, 110 S.Ct. at 1993; *Capital Cities, supra,* 467 U.S. at 714–16, 104 S.Ct. at 2708; *Midcal, supra,* 445 U.S. at 107, n. 10, 100 S.Ct. at 944, n. 10.[27] *Bacchus,* however, appears to have at least implicitly recognized that there might be other interests, related to the "perceived evils of an unrestricted traffic in liquor", 468 U.S. at 276, 104 S.Ct. at 3058, which fall within the "core concerns" as well. As the Court there stated:

"State laws that constitute mere economic protectionism are therefore not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor. Here, the State does not seek to justify its [facially discriminatory] tax on the ground that it was designed to promote temperance or to carry out any other purpose of the Twenty-first Amendment, but instead acknowledges that the purpose was 'to promote local industry.' " 468 U.S. at 276, 104 S.Ct. at 3058.

Two cases subsequent to *Bacchus,* while admittedly not answering the question dis-

---

**26.** Conversely, it would appear that a court must exercise some level of heightened scrutiny when evaluating such regulation, since "[i]t is by now clear that the [Twenty-first] Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause." *Bacchus, supra,* 468 U.S. at 275, 104 S.Ct. at 3057.

**27.** It has been held by certain federal District Courts that the promotion of temperance is the sole concern of the Twenty-first Amendment. *Loretto Winery, Ltd. v. Gazzara* (1985) S.D.N.Y., 601 F.Supp. 850, 861 ("[T]he powers reserved [to the states under the Twenty-first Amendment] must be exercised with temperance as their goal."), *aff'd as modified* 2d Cir., 761 F.2d 140. *See also Quality Brands, Inc. v. Barry* (1989) D.D.C., 715 F.Supp. 1138, 1142 (adopting the

*Loretto Winery* analysis), *aff'd* D.C.Cir., 901 F.2d 1130.

The Second Circuit's modification of the District Court's decision in *Loretto Winery* dealt not with the analysis pertaining to the Twenty-first Amendment, which the Second Circuit lauded as "comprehensive and thoughtful", 761 F.2d at 140, but with the time allotted for the New York Liquor Authority to comply with the District Court's order.

For reasons which will be discussed textually, we decline to adopt this very narrow reading of the scope of the Twenty-first Amendment in light of United States Supreme Court decisions subsequent to *Bacchus,* on which the District Court in *Loretto Winery* relied heavily. The *Loretto Winery* opinion, however, does provide an excellent framework and history of the Twenty-first Amendment.

positively, give guidance both for determining what interests other than temperance constitute a "core concern" of the Twenty-first Amendment, and for determining what level of scrutiny to be applied when evaluating a statute which, though facially discriminatory, does not seek to promote "economic protectionism."

In *Healy v. Beer Inst.* (1989) 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275, the Supreme Court addressed the constitutionality of a Connecticut "price affirmation" statute, which required that out-of-state beer shippers affirm that they were not charging higher prices at the time of affirmation to Connecticut than to other States. The Court had overturned such statutes before,[28] upon the theory that these types of statutes had the impermissible effect of regulating out-of-state commerce, and the Court reaffirmed that ground in *Healy*. 491 U.S. at 331–340, 109 S.Ct. at 2496–2501. The Court went on, however, to discuss the "facial invalidity" of the law, and concluded that, notwithstanding the statute's "legitimate" purpose of ensuring low prices for Connecticut consumers, it could not withstand Commerce Clause scrutiny. 491 U.S. at 340–41, 109 S.Ct. at 2501–02.

Justice Scalia, writing in concurrence (the lead opinion was supported by a five-Justice majority), concluded that the "statute's invalidity is fully established by its facial discrimination against interstate commerce ... and by Connecticut's inability to establish that the law's asserted goal of lower consumer prices cannot be achieved in a nondiscriminatory manner." 491 U.S. at 344, 109 S.Ct. at

2503. Justice Scalia went on to observe that the law was invalid "despite the fact that the law regulates the sale of alcoholic beverages, since its discriminatory character eliminates the immunity afforded by the Twenty-first Amendment." 491 U.S. at 344, 109 S.Ct. at 2504.

Although only Justice Scalia specifically relied upon the facially discriminatory character of the law as taking it outside the purview of the Twenty-first Amendment, the majority never analyzed the effect of the Twenty-first Amendment upon the statute's facial Commerce Clause invalidity (though it did conclude that the Twenty-first Amendment did not save the statute from invalidity due to extraterritorial effects). In our view, therefore, *Healy* supports the proposition that, a facially discriminatory liquor regulation is subject to the full force of the Commerce Clause, and is not "saved" by the Twenty-first Amendment, where the interest served by the law is, though legitimate, not a "core concern" of the Twenty-first Amendment.[29]

The second Supreme Court case which offers insight into the parameters of the Twenty-first Amendment is *North Dakota v. United States, supra,* 495 U.S. 423, 110 S.Ct. 1986. *North Dakota* is, in some ways, more directly analogous than *Healy,* because it appears that the Court in *North Dakota* faced the issue of the extent to which the advancement of the Twenty-first Amendment's "core concerns" "saves" an otherwise facially discriminatory state statute.[30] In

---

28. *See, e.g., Brown–Forman Distillers, supra,* 476 U.S. 573, 106 S.Ct. 2080.

29. This analysis explains our reluctance to apply *in toto* the analysis used by the Fifth Circuit in *McBeath, supra,* 11 F.3d 547, despite the fact that, from a constitutional standpoint, that case appears to be "on all fours" with the present case. While we find persuasive merit in *McBeath*'s analysis of the Commerce Clause, our point of difference with the *McBeath* court lies with the Twenty-first Amendment analysis. The court cites Justice Scalia's concurring opinion in *Healy* for the following proposition: "The core concerns underlying the Twenty-first Amendment are not entitled to greater weight than the principle of nondiscrimination animating the Commerce Clause." 11 F.3d at 554. We respectfully disagree with the court's characterization of Jus-

tice Scalia's statement. There is no mention in *Healy* that Connecticut argued that seeking lower prices for consumers was a "core concern" of the Twenty-first Amendment, and no mention was made in Justice Scalia's opinion of such a "core concern." Indeed, such an argument would seem to be at odds with the undisputed "core concern" of promoting temperance, since by seeking lower prices for its citizens a State would presumably be taking steps toward increased, rather than decreased, consumption. Thus, we do not read *Healy* as addressing the interplay between the "core concerns" of the Twenty-first Amendment and the Commerce Clause.

30. *North Dakota* dealt with challenges based upon intergovernmental immunity and preemption, as opposed to the Commerce Clause. How-

*North Dakota*, the Court upheld, over inter-governmental immunity [31] and preemption challenges, the State's requirements that out-of-state liquor suppliers affix labels to each "item" shipped to federal military bases located within the State, and also to file monthly reports stating how much liquor they had sent into the State.[32]

A brief recitation of the facts of *North Dakota* is necessary to understand the Court's disposition. The State is home to a pair of federal military bases, and prior to the litigation, the Defense Department issued a directive requiring that federal bases purchase alcohol from the lowest-cost supplier, rather than an in-state supplier, as had been the rule. North Dakota had established a regulatory system for importation of alcohol, by which out-of-state suppliers could only sell to licensed in-state wholesalers, or to the federal bases. 495 U.S. at 428, 110 S.Ct. at 1990–91. Licensed wholesalers, on the other hand, could sell to licensed retailers, other wholesalers, or the federal bases. *Id.*[33] The issue in the case was the constitutionality of the State's reporting and labeling require-ments, which were applied only to out-of-state suppliers.

A four-Justice plurality first determined that the purposes of the state statute were to "promote temperance and ensure orderly market conditions", 495 U.S. at 426, 110 S.Ct. at 1990, and concluded that the regulations "fall within the core of the State's power under the Twenty-first Amendment." 495 U.S. at 432, 110 S.Ct. at 1993. Previously in the opinion, the plurality had noted that the States can "take appropriate steps to prevent the unlawful diversion of liquor into their regulated intrastate markets." 495 U.S. at

431, 110 S.Ct. at 1992. The plurality went on to describe the risk of unlawful diversion of out-of-state liquor into the state from the federal bases as "both substantial and real", 495 U.S. at 433, 110 S.Ct. at 1993, and concluded that the requirements "are necessary components of the regulatory regime." 495 U.S. at 432, 110 S.Ct. at 1993.

In an opinion concurring in part in the judgment and dissenting in part, four Justices initially agreed that the Court had held that the States have power "to regulate shipments of liquor through their territory 'insofar as necessary to prevent' unlawful diversion in the absence of conflicting federal regulation." 495 U.S. at 450, 110 S.Ct. at 2003 (quoting *United States v. Mississippi Tax Comm'n* (1973) 412 U.S. 363, 377, 93 S.Ct. 2183, 2192, 37 L.Ed.2d 1). However, the partial dissent went on to observe, "We have never held, however, that any regula-tion with this avowed purpose is insulated from review under ... the dormant Com-merce Clause." *Id.* The partial dissent concluded that, while the reporting require-ment was valid, the labeling requirement "cannot be considered 'necessary' to the State's liquor regulatory regime by any defi-nition of the term. The State could achieve the same result in its effort to 'prevent the unlawful diversion of liquor into [its] regulat-ed intrastate markets,' [citing plurality opin-ion, 495 U.S. at 431, 110 S.Ct. at 1992], by instead requiring special labels on liquor shipped to in-state wholesalers." 495 U.S. at 449, 110 S.Ct. at 2002.

The two opinions in *North Dakota* appear to disagree as to degree rather than concept with respect to the level of "deference" to be

ever, the case is instructive because of the discus-sions within both the plurality and dissenting opinions concerning the effect of the Twenty-first Amendment when its "core concerns" are impli-cated by a facially discriminatory statute.

**31.** Intergovernmental immunity, derived (like preemption) from the Supremacy Clause, means the States may not regulate the Federal Govern-ment directly, nor discriminate against either the Federal Government, or those with whom the Federal Government deals. *North Dakota, supra,* 495 U.S. at 434–35, 110 S.Ct. at 1994–95.

**32.** *North Dakota* was a split decision, and no majority opinion was issued. All nine Justices

concurred in the judgment that the reporting requirements were valid, but four Justices dis-sented as to the validity of the labeling require-ments, which the dissent felt were not "neces-sary" to the State's regulatory scheme. 495 U.S. at 449, 110 S.Ct. at 2002. Justice Scalia con-curred in the judgment that both requirements were valid, but did not join the lead (four-Justice) opinion.

**33.** The plurality termed the regulatory system "unquestionably legitimate." 495 U.S. at 432, 110 S.Ct. at 1993.

given a facially discriminatory state statute aimed at promoting a "core concern" of the Twenty-first Amendment. The plurality does not suggest that the fact that a law promotes a "core concern" removes the law from constitutional scrutiny, and indeed goes to lengths to justify the necessity of the laws at issue in *North Dakota* to the furtherance of the "core concerns." Conversely, the partial dissent accepts the "necessity" of the reporting requirements, but argues that there are a number of ways the ends could be furthered other than the labeling requirement, the onerousness of which the partial dissent attempted to demonstrate at length, and which, it argued, "throws a wrench into the firm's entire production system." 495 U.S. at 449, 110 S.Ct. at 2002.

■ Taken together, and read with *Bacchus* and *Healy*, we conclude that the opinions in *North Dakota* support the following two propositions with respect to the Twenty-first Amendment. First, the "core concerns" of the Amendment include not only promotion of temperance, but also "protect[ing] the integrity of [a State's liquor distribution] system" against "the unlawful diversion of liquor into [the State's] regulated intrastate markets." *North Dakota, supra,* 495 U.S. at 426, 431, 110 S.Ct. at 1990, 1992. Laws designed to effectuate this end in effect equate to laws designed to combat the "perceived evils in an unrestricted traffic in liquor." *Bacchus, supra,* 468 U.S. at 276, 104

S.Ct. at 3058. Second, when an otherwise facially discriminatory law has the purpose, not of protecting local economic interests, *e.g., Bacchus,* or advancing a legitimate interest, though not "core concern," *e.g., Healy,* but of in fact advancing a "core concern," *e.g., North Dakota,* the law will be upheld if it is "necessary" to the furtherance of the "core concern." [34]

**B. Application to Indiana's Resident Ownership Requirement**

■ Judged by the above standard, it is clear that Indiana's resident ownership requirement cannot be "saved" from constitutional infirmity under the Commerce Clause by the Twenty-first Amendment, because the articulated interests proffered for its justification are not among the "core concerns" of the Twenty-first Amendment. Thus, the analysis employed in concluding that the resident ownership requirement violates the Commerce Clause applies with equal force here, and as demonstrated *supra* pp. 959–65, the resident ownership requirement fails under this "strict scrutiny" standard.

■ Furthermore, even if the interests purportedly served by the resident ownership requirement were "core concerns" of the Twenty-first Amendment, we would be unable to conclude that the requirement is "necessary" to the furtherance of those concerns.[35] While we admittedly have little

**34.** Conversely, when a State regulates in an "even-handed" manner to further a "core concern," even those courts which have held that "temperance" is the only such concern, recognize the validity of such regulation. *Loretto Winery, supra,* at 862. Presumably, this means that it is permissible for a State to "restrict" interstate commerce in a manner that would otherwise be inconsistent with the Commerce Clause, so long as the restriction burdens in-state and out-of-state economic interests evenly. Recognition of the States' greater latitude in this regard gives us reassurance that we are not interpreting the Twenty-first Amendment in an unduly restrictive manner.

With respect to the promotion of temperance, however, the *Loretto Winery* opinion demonstrates quite persuasively that temperance is unlikely to be promoted by regulations which discriminate between in-state and out-of-state economic interests. In *Loretto Winery,* the court struck down New York's attempt to permit "wine products" containing New York

grapes to be sold in grocery stores, while restricting sales of identical "wine products" with out-of-state grapes to package liquor stores. Rejecting the State's claim that a temperance goal was furthered by the regulation, the court aptly stated: "The drinkers will become just as drunk on [wine product] whether the grapes come from New York, California, or any of the six or so other states which produce wine grapes". 601 F.Supp. at 862.

**35.** We recognize that *Bacchus* may also plausibly be read to say that the Twenty-first Amendment affords no protection to *any* facially discriminatory law, since irrespective of the law's purpose, it amounts to "economic protectionism". 468 U.S. at 270, 104 S.Ct. at 3054. While we have already discussed *supra* pp. 964–66, our reasons for declining to adopt this reading of *Bacchus,* we note that, as that reading would afford even *less* "deference" to Indiana's resident ownership requirement (since the law would be judged under a "strict scrutiny" standard regardless of its

guidance as to exactly how closely the means employed by a State must fit with the "core concern" to justify the conclusion that the means are "necessary," this case does not require that these parameters be precisely defined, because there is no showing that the resident ownership requirement at issue here serves its purported interests at all. *Cf. Capital Cities, supra,* 467 U.S. at 716, 104 S.Ct. at 2708 (Oklahoma restriction on liquor advertising struck down despite fact that restrictions were "reasonable, albeit limited, means of furthering the goal of promoting temperance"); *Midcal, supra,* 445 U.S. at 114, 100 S.Ct. at 947 (California scheme of resale price maintenance purportedly aimed at promoting temperance struck down where no showing was made of how the scheme actually furthered that goal).

Comparison to the regulatory system considered in *North Dakota,* which a plurality of Supreme Court Justices termed "unquestionably legitimate", 495 U.S. at 432, 110 S.Ct. at 1993, is instructive. While the Court in that case was ruling upon a facet of the regulatory system other than its residency requirements, we find great relevance in the fact that North Dakota, which certainly has a very legitimate interest in maintaining tight control over its distribution system and ensuring compliance with its laws (certainly as legitimate as Indiana's), does not impose a resident ownership requirement of any type on its corporate wholesaler permittees. Rather, North Dakota requires only that "the manager of the licensed premises" of a corporate wholesaler be a resident of the State. N.D.Cent.Code § 5–03–01 (1987 Repl.). With respect to the corporate permittee's officers, directors, and shareholders, North Dakota only requires that they be "citizens of the United States and persons of good moral character." *Id.* North Dakota also requires that corporate applicants for wholesale liquor permits be "properly regis-

tered with the secretary of state." *Id.*[36] Obviously, an in-state residency requirement such as North Dakota's has the effect of burdening far less interstate commerce than Indiana's resident ownership requirement, while seeming to target a management level (manager of the in-state licensed premises) much more likely to be involved in the permittee's actual operations, and thus more likely to be involved with the permittee's compliance with state law.

*North Dakota* is also instructive because it was clear in that case that the reporting and labeling requirements actually served the ends sought to be achieved. Even the partial dissent (which concurred as to the validity of the reporting requirement) did not take issue with the premise that, by requiring out-of-state importers to affix labels to the "items" of alcohol shipped to federal bases located within North Dakota, the State's goal of keeping liquor bound for those bases out of the State's intrastate system was served; rather, the partial dissent felt the labeling requirement was invalid *only* because the goal could be served through alternative means. 495 U.S. at 449–50, 110 S.Ct. at 2002.

By comparison, the justifications for the resident ownership requirement at issue here rest upon the unsubstantiated premise that the residency of a corporate permittee's shareholders relates to the permittee's compliance with Indiana law. Even if we were to agree conceptually with the idea that a State may utilize in-state residency requirements as a "proxy" restriction with respect to ensuring compliance with state law,[37] the resident ownership requirement at issue here, which seems to result in significant interference with interstate commerce while targeting the management level least likely to be involved in a permittee's actual compliance

---

purpose), the result reached under that standard would be consistent with the result we reach.

**36.** North Dakota has revised certain provisions of its regulatory scheme effective August 1, 1996. The requirements discussed here, however, are unaffected by these revisions. *See* N.D.Cent. Code § 5–03–01 (1995 Repl.).

**37.** It could be argued that the *North Dakota* dicta describing the State's regulatory regime, which included an in-state residency requirement for the manager of a wholesaler's licensed premises, as "unquestionably legitimate", compels such agreement, at least with respect to the narrow, precisely aimed requirement at issue in that case.

with state law, does not even come even close to such an acceptable "proxy."

Finally, we note that this analysis applies equally under either National and Olinger's or Indiana Wholesale's interpretation of the resident ownership requirement, for the "nexus" between the residency of a corporation's shareholders and the corporation's compliance with Indiana law is, if anything, even less well served when the resident ownership requirement is read to require only "meaningful participation," as opposed to "unilateral control." [38]

## CONCLUSION

Because of the unique nature of the remedy granted to the IABC by I.C. 7.1–2–8–3, it was proper for National and Olinger to be included as parties to this action.

Because I.C. 7.1–23–21–5 facially discriminates against interstate commerce, and cannot be justified as the least restrictive means of achieving a non-discriminatory objective, it violates the Commerce Clause. The law is not saved from invalidity by the Twenty-first Amendment, because it cannot be justified by its advancement of any of the "core concerns" of that Amendment. Further, even if the justifications for the resident ownership requirement were held to fall within the "core concerns" of the Twenty-first Amendment, the requirement would not be saved, because its categorical in-state resident ownership requirement, which applies to wholesaler permittees at the level through which interstate commerce flows most heavily, and

which is least likely to be involved in whether a permittee actually complies with Indiana law, cannot be considered "necessary" to the furtherance of the proffered justifications.

The judgment of the trial court is reversed.

FRIEDLANDER and BAKER, JJ., concur.

---

38. We devote only a footnote to National and Olinger's argument that Congress, operating through its "positive" Commerce Clause power, insulated Indiana's resident ownership requirement from challenge under the "negative" Commerce Clause with the passage of the Webb–Kenyon Act. We find no merit in this argument. National and Olinger have not cited a case in which a court, federal or state, has held that the States have any greater regulatory authority under the Act than that conferred by the Twenty-first Amendment, and we find nothing from our research which suggests that such was intended. *See Craig v. Boren* (1976) 429 U.S. 190, 205, 97 S.Ct. 451, 461, 50 L.Ed.2d 397 ("The wording of § 2 of the Twenty-first Amendment closely follows the Webb–Kenyon and Wilson Acts, expressing the framers' clear intention of constitutionalizing the Commerce Clause

framework established under those statutes."), *reh'g denied* 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574; *cf. Georgia v. Wenger* (1950) E.D.Ill., 94 F.Supp. 976, 981 ("In so far as the Twenty-first Amendment has been subjected to judicial interpretation the same scope, meaning and purpose has been ascribed to it as to the Webb–Kenyon Act."), *aff'd* (1951) 7th Cir., 187 F.2d 285. Thus, we decline National and Olinger's invitation to read the Webb–Kenyon Act in a way that no court heretofore has done.

Given our conclusion that Indiana's resident ownership requirement is invalid under the "negative" Commerce Clause, and is not "saved" from invalidity by either the Twenty-first Amendment or the Webb–Kenyon Act, we need not reach the parties' arguments concerning Indiana's Equal Privileges Clause, Ind. Const. Art. 1, § 23.