United States Court of Appeals,

Fifth Circuit.

No. 91-8346.

Steve C. COOPER and Richard L. Wilson, Plaintiffs-Appellees,

v.

W.S. McBEATH, Defendant-Appellant,

and

Licensed Beverage, Licensed Beverage Distributors Association, Inc., et al., Intervenor-Defendants-Appellants.

Jan. 13, 1994.

Appeal from the United States District Court for the Western District of Texas.

Before REYNALDO G. GARZA, and JONES, Circuit Judges.[*]

EDITH H. JONES, Circuit Judge:

The chief question in this case is whether certain portions of the Texas Alcoholic Beverage Code ("Code") violate the Commerce Clause and/or the Privileges and Immunities Clause of the United States Constitution. Finding that the dispute is not moot and that the plaintiffs possess ample standing to challenge the statutes, we determine that the Code's durational residency and citizenship requirements amount to simple economic protectionism and therefore run afoul of the Commerce Clause. Moreover, the Twenty-first Amendment provides no sanctuary for these parochial statutes. Accordingly, we affirm the district court's grant of summary judgment in favor of the plaintiffs.

FACTS AND PRIOR PROCEEDINGS

The pertinent facts of this "brewing" controversy are straightforward. Richard L. Wilson and Steve C. Cooper are residents of Florida and Tennessee, respectively. Together, they seek to own and operate a topless nightclub in San Antonio called Baby Dolls, which is operated by K.S. Enterprises, Inc. ("KSE"), a Texas corporation holding a mixed beverage permit issued by the Texas Alcoholic Beverage Commission ("TABC" or "Commission"). Toward this end, Wilson and Cooper

[*]Due to his death on August 29, 1993, Judge Williams did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

established Bexar County Enterprises, Inc. ("BCE"), a Tennessee corporation wholly owned by Wilson and Cooper.

In September, 1990, BCE purchased 497 of KSE's stock and acquired an option to purchase the remaining shares whenever the legality of the transaction under the Code could be established (*i.e.*, whenever the transfer could occur without jeopardizing the liquor permit held by KSE). Apparently, BCE later transferred its KSE stock and the option to purchase the remaining shares to Wilson and Cooper, individually.[1] The remaining KSE shares are held in escrow, and are to be transferred to plaintiffs whenever the permit is free from threat of revocation.

The instant dispute arose because several provisions of the Texas Alcoholic Beverage Code ("Code") require a sustained period of Texas citizenship and/or residency before the Commission can issue a mixed beverage permit. The Commission refused to conduct background investigations on Wilson and Cooper because they, as non-Texas residents, were deemed per se ineligible under Texas law to hold a liquor permit.

The challenged Code provisions at that time provided:

U Section 11.46(a)(11) allows the TABC to refuse a permit to any applicant who has not been a Texas citizen for the three years immediately preceding his permit application.[2]

U Section 11.61(b)(19) allows the TABC to cancel a permit upon finding that the permittee was not a Texas citizen for the three years immediately preceding his permit application.[3]

U Section 28.04, relating to changes in corporate control, forbids renewal of a mixed beverage permit if there has been a change of ownership of over 507 of the corporate stock, unless the transferee is "qualified" to hold the permit.

U Section 109.53, located in the Code's regulatory and penal provisions, states unequivocally that "[n]o person who has not been a citizen of Texas for a period of three years immediately preceding the filing of his application therefor shall be eligible to receive a permit under this code."

Section 109.53 also includes what is commonly known as the "51 percent rule," which forbids

---

[1]At oral argument, it was adduced that BCE no longer exists.

[2]"Applicant" is defined in § 11.45 to include the owners of a majority of the corporate stock.

[3]"Permittee" is defined in § 11.61(a) to include the owners of a majority of a corporation's stock.

the issuance of a permit to any corporation "unless at least 51 percent of the stock of the corporation is owned at all times by citizens who have resided within the state for a period of three years[.]" Any corporation holding a permit in violation of this section risks the forfeiture of its corporate charter.

Under these Code provisions, consummation of the contemplated sale of KSE's remaining shares would have required the Commission to revoke KSE's permit. Accordingly, Wilson and Cooper filed suit in federal district court seeking declaratory and injunctive relief against these provisions, which, they contend, violate the Privileges and Immunities Clause found in Art. 4, § 2 of the U.S. Constitution and/or the Commerce Clause by prohibiting any person from owning a majority ownership in a permit-holding corporation unless that person has satisfied Texas' three-year durational residency and citizenship requirement.[4] After first finding that Wilson and Cooper possessed standing to assert their claims and that their action was ripe for adjudication, the district court declared the four Code provisions unconstitutional under both doctrines and enjoined their enforcement. All Defendants, W.S. McBeath as Administrator of the TABC and various private, Texas-based liquor interests acting as Intervenors-Defendants, timely appealed.[5]

Recent Developments

On June 19, 1993, 73 days after oral argument in this case, the Governor of Texas signed H.B. 1445 into law. H.B. 1445, whose relevant provisions became effective September 1, amended the Texas Alcoholic Beverage Code in several respects. Most important for our purposes, the revisions replaced the challenged three-year residency requirement with a one-year version. Plaintiffs (the out-of-state individuals desiring the permit) filed a suggestion of mootness urging that the Code amendments have rendered the case moot. The various Defendants argued otherwise, and we carried the motion with the case.

Preliminary Motions

---

[4]Three advocacy organizations, the Texas Package Store Association, Wholesale Beer Distributors of Texas, Inc., and Licensed Beverage Distributors Association, Inc., were granted permission to intervene as defendants.

[5]For the sake of simplicity and because each Defendant is assumed to adopt the others' arguments, the various Defendants are referred to jointly as "Defendants" unless otherwise indicated.

1. *Mootness*

The case is not moot. Our holding on this question is controlled by the Supreme Court's recent decision in *Associated General Contractors of America v. City of Jacksonville,* --- U.S. ----, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). In that case, the city of Jacksonville, Florida had enacted an ordinance establishing minority set-asides for city contracts. Twenty-two days after the Supreme Court granted certiorari, the city repealed the ordinance, replacing it with another ordinance which, although different from the original, still set aside certain contracts for certified black- and female-owned business. Claiming that there was no longer a live controversy with respect to the constitutionality of the repealed ordinance, the city argued that the case should be dismissed as moot. In analysis squarely applicable to the instant case, the Supreme Court disagreed:

> [T]he mootness question is controlled by *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), where we applied the "well settled" rule that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.,* at 289, 102 S.Ct., at 1074. Although the challenged statutory language at issue in *City of Mesquite* had been eliminated while the case was pending in the Court of Appeals, we held that the case was not moot, because the defendant's "repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." *Ibid.*
>
> This is an *a fortiori* case. There is no mere risk that Jacksonville will repeat its allegedly wrongful conduct; it has already done so. Nor does it matter that the new ordinance differs in certain respects from the old one. *City of Mesquite* does not stand for the proposition that it is only the possibility that the *selfsame* statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect. The gravamen of petitioner's claim is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors ... it disadvantages them in the same fundamental way. [footnote omitted]

--- U.S. at ----, 113 S.Ct. at 2301. *See also, Resident Council of Allen Parkway Village v. HUD,* 980 F.2d 1043, 1048 (5th Cir.1993), *pet. for cert.* filed May 17, 1993 (in a challenge to a federal agency's proposed decision to demolish a public housing project, the agency's subsequent decision to reject the demolition application in no way mooted the Plaintiffs' request for injunctive relief.)

Although "[a] case might become moot if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *United States v. Concentrated Phosphate Export Ass'n.,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344

(1968), that cannot be said of the instant case. Texas' decision to supplant the three-year requirements with a one-year version does not prevent the state from later restoring the latter if this Court were to find it constitutional. Here, the new one-year residency/citizenship requirement may lessen the burden placed on the Plaintiffs, but insofar as they remain out-of-state with declared intentions of staying that way, the amendments' practical effect remains the same: Plaintiffs, as non-Texans, are treated differently. Contrary to their assertion that H.B. 1445 has somehow operated to "repeal[ ] *any* residency requirement for non-Texans to own stock in Texas corporations with liquor permits," there persist some statutory impediments to their control, as nonresidents, of a permit-holding corporation.[6]

Neither of the traditional bases for mootness exists here. First, the issue presented—does the State's residency/citizenship requirement violate the Constitution?—is still quite live. *See Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Second, the parties still possess "a legally cognizable interest in the outcome." *Id.* Accordingly, although mootness is a close question here, Appellees' motion suggesting mootness is denied.

2. *Standing*

A second question is whether Cooper and Wilson lack adequate standing to maintain a suit. As defendants frame the argument, Cooper and Wilson are seeking to prevent injury to "the real party in interest in this case, namely KSE, the Texas permit-holding corporation, rather than suing to redress any injury to themselves:

---

[6]Section 16 of H.B. 1445, 73rd Leg.R.S., amends the Alcoholic Beverage Code by adding § 6.03, a lengthy revision of the Code's citizenship requirements. § 6.03(g) declares that "there is no longer need for the three-year residency requirements with regard to those segments of the industry that sell alcoholic beverages to the ultimate consumer only." (Vernon Supp.1993). It then states that the law retains a one-year requirement for those involved in certain other liquor-based enterprises. While the amended statute permits nonresidents to own the majority of stock in a corporate permit-holding retailer that is incorporated in Texas, it also requires *all* of the officers and a majority of the directors to have resided in the state for at least one year preceding the application for a liquor license. § 6.03(k) (Vernon Supp.1993). Further, § 28.04(d) of the Code, as amended by H.B. 1445, permits the renewal of a liquor permit by a corporation in which legal or beneficial ownership of over 507 of the stock has changed since the original permit was issued *if* the applicant complies with § 11.46—which contains a one-year residency requirement. § 11.46(a)(11) (Vernon Supp.1993). These more narrow residency requirements appear to apply to Cooper and Wilson, who filed affidavits stating that they have no intention of ever residing in Texas.

Plaintiffs have brought their claims in their individual capacities and in essence challenge a provision of the Code which is a restriction on the right of a Texas corporation to hold a permit to sell alcoholic beverages in Texas.... Plaintiffs neither seek a permit as a sole proprietorship under the Code nor do they presently hold a permit. Under the facts in the record the district court erred in its determination that Plaintiffs have standing to assert their claim.

We disagree and affirm the district court's ruling, which held that the statutes bar Plaintiffs' efforts as *individuals* to purchase and operate KSE. Defendants' protests of "subterfuge" aside, it is immaterial that the Plaintiffs are suing in their individual capacities and are not seeking to obtain a permit in their individual names. According to the Amended Complaint, the option to purchase the remainder of KSE's stock currently rests with Wilson and Cooper individually, and the record shows they are to receive the remaining 51 percent once the transfer can occur without endangering the permit. Plaintiffs allege a direct and personal injury—a limit on their ability as individuals to own a majority interest in a Texas, permit-holding corporation. The conditional nature of the sale further augments the determination of injury. KSE also has an interest in the dispute—who will its majority owners be?—but the Supreme Court has recognized that shareholders with an identifiably direct and personal interest in a cause of action can bring suit "even if the corporation's rights are also implicated." *Franchise Tax Bd. of Cal. v. Alcan Aluminium,* 493 U.S. 331, 336, 110 S.Ct. 661, 665, 107 L.Ed.2d 696 (1990); *see also Nowling v. Aero Services Intern., Inc.,* 752 F.Supp. 1304, 1314 (E.D.La.1990). Moreover, the 51 percent rule contemplates that direct focus is upon the shareholders. This would seem particularly important when the entity involved is, as here, a closely held corporation.

Having disposed of this introductory question, which touches upon the prudential wing of the standing doctrine, we now decide whether the Plaintiffs have satisfied the requisite elements for Article III standing. As the Supreme Court neatly summarized in the recent case, *Lujan v. Defenders of Wildlife,* --- U.S. ----, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), plaintiffs must have suffered an "injury in fact," caused by the challenged government conduct, which is likely to be redressed by the relief they seek.

Wilson and Cooper easily satisfy these elements. First, because they are non-Texas citizens, they are personally prevented from acquiring the remaining stock of KSE because of the

Commission's threatened revocation of KSE's liquor permit. They are asserting their own constitutional rights based on specific injury. Second, it is indisputable that threatened enforcement of the challenged Code provisions has caused their injury; the statute is an absolute bar to Plaintiffs' majority ownership of the holder-corporation. As McBeath concedes, "acquisition of any additional stock by either BCE or the individual plaintiffs would cause KSE to be disqualified. *The defendant would immediately initiate an administrative action to cancel KSE's permit.*"[7] (emphasis added). Finally, the injury would be redressed by a favorable ruling striking down the residency/citizenship requirement.

None of the prudential concerns favoring judicial self-restraint counsels against deciding the constitutional questions presented today. *See, e.g., Apache Bend Apts. v. U.S. Through I.R.S.,* 987 F.2d 1174, 1176-77 (5th Cir.1993) (en banc) (and cases cited and discussed therein, explicating the foundations for the judiciary's policy of avoiding the unnecessary resolution of constitutional issues). As this court recently emphasized *en banc* in *Apache Bend,* the federal judiciary's power to adjudicate constitutional disputes "is reserved for those instances in which it is necessary for the vindication of individual rights." *Id.* at 1176. The Plaintiffs have alleged a redressable injury sufficient to satisfy Article III and otherwise suitable for judicial review.

We now turn to the principal issue: whether the challenged provisions offend the Constitution.

Texas v. The Commerce Clause

1. *The Clause Itself*

The Commerce Clause states: "The Congress shall have power ... To regulate Commerce ... among the several States[.]" U.S. Const., Art. I, § 8, cl. 3. It is well settled, however, that while

---

[7]McBeath's promise of threatened enforcement is likewise sufficient to thwart any assertion that the dispute lacks ripeness. Substantial hardship—the touchstone for determining when review if appropriate—exists where the enforcement of a statute is assured and the only obstacle to ripeness is merely a delay before the action or proceedings commence. "Where the application of a law is inevitable and consequences attach to it, the Court will find the matter ripe before the actual proceedings occur." Erwin Chemerinsky, FEDERAL JURISDICTION § 2.3, at 105 (1989). *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 152, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967); *Caprock Plains Federal Bank v. Farm Credit Admin.,* 843 F.2d 840, 844-46 (5th Cir.1988).

its literal terms speak only of powers bestowed upon Congress, the clause also contains a "dormant" facet that serves as "a substantive restriction on permissible state regulation of interstate commerce." *Dennis v. Higgins,* --- U.S. ----, ----, 111 S.Ct. 865, 870, 112 L.Ed.2d 969 (1991) (internal quotation marks omitted). As the Supreme Court has emphasized, "This "negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273-74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). The Court has also struck down state efforts to grant its own residents preferred rights of access over nonresidents to resources located within its borders. *See, e.g., Hughes v. Oklahoma,* 441 U.S. 322, 337-38, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979).

In analyzing cases of alleged economic isolationism brought under the Commerce Clause, the Supreme Court has constructed a two-ti ered approach. Under this framework, state statutes that directly discriminate against interstate commerce, or whose effects favor in-state economic interests at the expense of out-of-staters, are routinely struck down, *see, e.g., Limbach,* 486 U.S. 269, 108 S.Ct. 1803; *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982); *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (statute prohibiting entry into an industry by non-residents is facially invalid under Commerce Clause); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Limbach,* 486 U.S. at 274, 108 S.Ct. at 1808; *see also, e.g., Maine v. Taylor,* 477 U.S. 131, 138-39, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986).

When, however, a statute regulates in an evenhanded manner and had only direct effects on interstate commerce, we assess "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman Distillers v. N.Y. State,* 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) (citing the flexible balancing approach first articulated by *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). While no clear rule exists to tell us when to apply the stricter rule of invalidity, *see, e.g.,*

*Brown-Forman,* 476 U.S. at 579, 106 S.Ct. at 2084, a finding of economic protectionism can be based solely upon a statute's discriminatory effect. *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 270, 104 S.Ct. 3049, 3054-55, 82 L.Ed.2d 200 (1984).

Because the 51 percent ownership requirement, the crux of the dispute, was enacted immediately following the repeal of the Eighteenth Amendment it cannot fairly be viewed as protectionist in its original intent, since no local liquor industry then existed in Texas. But that is only half the inquiry. As announced above, protectionism (while absent in motivation) can manifest itself in effect. Such overt, in-state favoritism as the TABC provisions embody cannot be ignored as incidental.

From a practical standpoint, there can be little doubt that the State is not entitled to the lesser standard of scrutiny of *Bruce Church.* Since 1935, when post-Prohibition Texas enacted its comprehensive regulatory scheme concerning the distribution and sale of alcoholic beverages, every permit issued has been granted only to Texans. As the Plaintiffs note, under Texas law, "no foreigners need apply." Although someone from out-of-state is permitted to own a minority interest in a Texas, permit-holding corporation, the Code's plain terms forbid non-Texans from acquiring majority ownership. This impenetrable barrier to entering the Texas liquor industry on substantially equal terms as Texans enjoy discriminates against out-of-staters.

But while the State is not entitled to the more flexible approach, even plainly discriminatory statutes may survive a Commerce Clause challenge if the State can demonstrate that the statutes advance "a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Limbach,* 486 U.S. at 278, 108 S.Ct. at 1810. The burden rests with Texas to rescue its statutes.[8] The standards for such a task, however, are towering. *Cf., Hughes,* 441 U.S. at 337, 99 S.Ct. at 1737 ("[F]acial discrimination by itself may be a fatal defect" and "[a]t a minimum ... invokes the strictest scrutiny"); *City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535 ("[W]here simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has

---

[8]Since the burden rests with the State to justify its statutes, we reject Defendants' argument that the district court erred in not requiring the Plaintiffs to prove discriminatory intent.

been erected").

Defendants' purported justifications are unpersuasive and insufficient to defend the State's arbitrary treatment of non-Texans. The State contends first that its distribution system was established "to protect the health, safety, welfare, morals and temperance" of its citizens. Tex.Alco.Bev.Code Ann. § 1.03 (West 1978) (articulating these as the policy goals underlying the Texas Liquor Control Act). Such boilerplate enabling language hardly explains the State's particular restrictions on out-of-state ownership of various liquor licenses.

As their practical justification for the Code's in-state residency requirement, Defendants assert that the Commission's approval of alcoholic beverage permits is based on an intensely local screening of each applicant's reputation in the community plus a complete, thorough business and financial investigation performed by TABC. Further, the Commission's ability to investigate an out-of-state applicant's reputation and qualifications is severely limited. But however legitimate may be the State's ultimate goals, it cannot pursue them via the illegitimate means of a flat proscription of non-Texans. *See City of Philadelphia,* 437 U.S. at 626-27, 98 S.Ct. at 2537 ("whatever [a State's] ultimate purpose, it may not be accomplished by discriminating ... [against out-of-state citizens] unless there is some reason, apart from ... origin, to treat them differently").

In addition to demonstrating the statutes' local benefits, the State must prove the unavailability of neutral alternatives adequate to protect the interests at stake. *E.g., Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736 (internal citation omitted). In this age of split-second communications by means of computer networks, fax machines, and other technological marvels, there is no shortage of less burdensome, yet still suitable, options. At first blush, interstate investigations would seem hardly more difficult than intrastate ones. If Texas desires to scrutinize its applicants thoroughly, as is its right, it can devise nondiscriminatory means short of saddling applicants with the "burden" of residing in Texas.[9] Nonresident liquor license applicants may be required to furnish whatever information the

---

[9]Defendants have not requested a remand nor suggested that, if given the opportunity, they could prove that the barrier erected against non-Texans furthers legitimate concerns that cannot adequately be advanced by neutral alternatives. Because we are convinced that Texas enjoys numerous options capable of serving its interests short of a flat ban, remand would be a poor use of the judiciary's finite resources. *Cf. Fort Gratiot Landfill v. Mich. Dept. of Nat. Res.,* --- U.S. --

State deems necessary, together with a release to permit rigorous verification checks. The state's penalties for duplicity should apply equally to resident or nonresident permit-holders, as may its provisions requiring the furnishing of bonds by permit holders. Out-of-state applicants may be required to file a consent to suit in Texas courts. Texas law already denies applications to corporations not organized under the laws of Texas, Tex.Alco.Bev.Code Ann. § 109.53 (West Supp.1993), and a holder-corporation that violates the State's laws faces revocation of its permit, dissolution of its corporate charter, and other civil and criminal penalties. The entity's employees or supervisors can, of course, be criminally prosecuted regardless where they reside.

While the State has ineffectively attempted to justify its statutes "in terms of the local benefits flowing from [them]," it has also failed to demonstrate "the unavailability of nondiscriminating alternatives adequate to preserve the local interests at stake." *Wyoming v. Oklahoma,* --- U.S. ----, ----, 112 S.Ct. 789, 801, 117 L.Ed.1 (1992). So long as an applicant meets the necessary qualifications and comports himself according to the governing standards, the State would be hardpressed to offer a justification substantial enough to authorize a wall prohibiting equal competition of non-Texans in the retail liquor business.

2. *The Twenty-first Amendment*

The Defendants posit an alternative argument: even if the statutes violate traditional Commerce Clause principles, the Twenty-first Amendment imbues the States with carte blanche authority to manage the flow of alcohol within their borders. Section 2 of that Amendment provides: "The transportation or importation into any State ... for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const.Amend. XXI, § 2.

The assertion that § 2 of the Twenty-first Amendment automatically trumps the rigors of the Commerce Clause cannot stand:

> To draw a conclusion ... that the Twenty-first Amendment has somehow operated to "repeal" the Commerce Clause wherever regulation of intoxicating liquors is concerned would ... be an absurd oversimplification. If the Commerce Clause had been *pro tanto* "repealed," then Congress would be left with no regulatory power over interstate or foreign commerce in intoxicating liquor. Such a conclusion would be patently bizarre and is demonstrably

--, ---- n. 8, 112 S.Ct. 2019, 2027 n. 8, 119 L.Ed.2d 139 (1992).

incorrect.

*Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 331-332, 84 S.Ct. 1293, 1298, 12 L.Ed.2d 350 (1964). Older caselaw embraced the broad proposition that the Amendment had granted the States almost unfettered authority to regulate commerce in intoxicating liquors unconstrained by negative Commerce Clause restrictions. *See, for example, State Board of Equalization v. Young's Market Co.,* 299 U.S. 59, 62-63, 57 S.Ct. 77, 78-79, 81 L.Ed. 38 (1936) and its progeny. This is no longer the end of the matter. While subsequent Supreme Court opinions have at times alluded back to the *Young's Market* view that the Amendment confers "virtually complete control over ... how to structure the liquor distribution system," *Cal. Retail Liquor Dealers Ass'n v. Midcal Alum.,* 445 U.S. 97, 110, 100 S.Ct. 937, 946, 63 L.Ed.2d 233 (1980), this unique power is not absolute and must coexist with Congress' power to regulate commerce. In *Bacchus,* which shared the instant case's focus on states' authority to regulate liquor unconstrained by the negative Commerce Clause, the Supreme Court put it succinctly: "It is by now clear that the Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause." *Bacchus,* 468 U.S. at 275, 104 S.Ct. at 3057.

The Twenty-first Amendment does not necessarily immunize state laws from invalidation under the Commerce Clause, and the chief question is whether the interests implicated by a State's regulation "are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 714, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984). "[T]he central purpose of the Amendment was not to empower States to favor local liquor industries by erecting barriers to competition. It is also beyond doubt that the Commerce Clause itself furthers strong federal interests in preventing economic Balkanization." *Bacchus,* 468 U.S. at 276, 104 S.Ct. at 3058 (citations omitted). While courts have recognized generally the need "to combat the perceived evils of an unrestricted traffic in alcoholic beverages" as a permissible, if vague, purpose of the Twenty-first Amendment, *see id.,* "laws that constitute mere economic protectionism are ... not entitled to the same deference." *Id.* The core concerns underlying the

Twenty-first Amendment are not entitled to greater weight than the principle of nondiscrimination animating the Commerce Clause. *Healy v. Beer Institute, Inc.,* 491 U.S. 324, 344, 109 S.Ct. 2491, 105 L.Ed. 275 (1989) (Justice Scalia, concurring).

The statutory barrier Texas has erected against non-residents who wish to obtain mixed beverage permits results in shielding the State's operators from the rigors of outside competition. This rule subjects such laws to the Commerce Clause's insistence on nondiscrimination. And contrary to Defendants' assertions, the state's interest in facilitating background checks of permit applicants by discriminating against nonresidents is not within the "core concerns" of the Twenty-first Amendment. *Compare North Dakota v. U.S.,* 495 U.S. 423, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) (state's liquor labeling and reporting requirements are within core of state powers under Twenty-first Amendment). The discriminatory three-year residency requirement inherent in the challenged statutory provisions cannot stand.[10]

## CONCLUSION

For the foregoing reasons, the motion to dismiss as moot is denied, and the district court's judgment for the Plaintiffs is AFFIRMED.

Motion DENIED; Judgment AFFIRMED.

---

[10]Since we dispose of this case on Commerce Clause grounds, we need not address Plaintiffs' alternative argument, that the challenged statutes breach the Privileges and Immunities Clause of Art. IV, § 2.