# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1948
_____

Sarasota Wine Market, LLC, et al.

*Plaintiffs - Appellants*

v.

Eric S. Schmitt, Attorney General of Missouri, et al.

*Defendants - Appellees*

------------------------------

Wine & Spirits Wholesalers of America, Inc.; American Beverage Licensees;
National Beer Wholesalers Association; Missouri Beer Wholesalers Association

*Amici on Behalf of Appellees*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: September 24, 2020
Filed: February 16, 2021
_____

Before LOKEN, SHEPHERD, and ERICKSON, Circuit Judges.
_____

LOKEN, Circuit Judge.

An amendment to the Missouri Liquor Control Act permits licensed in-state retailers to deliver alcohol directly to Missouri consumers. This is an action by four plaintiffs -- Sarasota Wine Market LLC, a Florida-licensed wine retailer; Heath Cordes, its owner-operator; and Michael Schlueter and Terrence French, two Missouri residents who would like to have direct delivery of wines not sold in the State (collectively, "Sarasota") -- against three Missouri officials acting in their official capacities -- Attorney General Eric Schmitt; Dorothy Taylor, Supervisor of the Missouri Division of Alcohol and Tobacco Control;[1] and Governor Michael Parson (collectively, "the Officials"). Sarasota seeks prospective relief, alleging that Missouri's liquor control laws, by preventing out-of-state retailers from shipping directly to Missouri consumers, discriminate against interstate commerce and citizens of other States in violation of the "dormant" Commerce Clause, art. I, § 8, cl. 3, and the Privileges and Immunities Clause, art. IV, § 2, cl. 1. The district court[2] dismissed Sarasota's Amended Complaint, concluding it failed to state viable claims under the Commerce Clause or the Privileges and Immunities Clause when construed together with Section 2 of the Twenty-first Amendment. Sarasota appeals. Concluding their claims are foreclosed by Supreme Court and circuit precedents that presently govern these issues, we affirm.

## I. Background

Regulation by the States and the federal government of the manufacture, sale, and transportation of alcoholic beverages has a long, turbulent, controversial history,

---

[1]Dorothy Taylor, the current Supervisor, is substituted as an appellee pursuant to Federal Rule of Appellate Procedure 43(c).

[2]The Honorable Henry Edward Autrey, United States District Judge for the Eastern District of Missouri.

a history that continues to provoke disagreement among Justices of the Supreme Court and others.  See generally Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2462-70 (2019), and 2476-82 (Gorsuch, J., dissenting); Granholm v. Heald, 544 U.S. 460, 476-86 (2005), and 498-514 (Thomas, J., dissenting).  Our task of course is to apply the law as it exists today, not to take sides on these historical debates, but an understanding of this history is important in framing the issues we must decide.  Cf. Arnold's Wines, Inc. v. Boyle, 571 F.3d 185, 192 (2d Cir. 2009) (Calabresi, J., concurring); Bridenbaugh v. Freeman-Wilson, 227 F.3d 848, 853 (7th Cir. 2000).

The Eighteenth Amendment, ratified in 1919, was a rather brief experiment with a nationwide ban on the "manufacture, sale, or transportation" of alcohol.  The Twenty-first Amendment, ratified in 1933, ended Prohibition.  Section 1 of the Twenty-first repealed the Eighteenth Amendment.  Section 2, which is central to the issues before us, provides:  "The transportation or importation into any State . . . for delivery or use therein of intoxicating liquors, *in violation of the laws thereof*, is hereby prohibited."  (Emphasis added.)  Acting in response to the Twenty-first Amendment, Missouri promptly enacted the Liquor Control Act. 1933-34 Mo. Laws, Extra Session, pp. 77-95, now codified at Mo. Rev. Stat. Ch. 311.  The Act is "a comprehensive scheme for the regulation and control of the manufacture, sale, possession, transportation and distribution of intoxicating liquor." John Bardenheier Wine & Liquor Co. v. City of St. Louis, 135 S.W.2d 345, 346 (Mo. banc 1939).

Prior to Prohibition, some States enacted laws adopting a "three-tiered distribution model."  A primary purpose of this model is to prevent a return to "the English 'tied-house' system" in which alcohol producers monopolized distribution from producer to consumer, a system widely perceived as causing or at least contributing to the social ills of excess alcohol consumption and consumption by minors.  See Tenn. Wine, 139 S. Ct. at 2463 n.7.  Under the three-tiered model,

the producer sells to a licensed in-state wholesaler, who pays excise taxes and delivers the alcohol to a licensed in-state retailer. The retailer, in turn, sells the alcohol to consumers, collecting sales taxes where applicable.

Arnold's Wines, 571 F.3d at 187. A central feature of the separated tiers is to prohibit a member of one tier from having a financial interest in a member of a higher or lower tier. In the Liquor Control Act, Missouri -- like many States -- adopted a version of the three-tiered distribution model in implementing its authority under Section 2 of the Twenty-first Amendment. See S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control, 731 F.3d 799, 802 (8th Cir. 2013).[3]

Though there are no longer completely "dry" States, some States severely limit liquor sales and distribution by private individuals and companies. In Utah, for example, the State is the sole importer and main retailer of all alcoholic products other than light beer; in Michigan, the State is the only wholesaler for liquor but not for wine and beer.[4] Missouri, like most States, permits private retailers to sell alcohol to the public if they qualify for the appropriate license and comply with Missouri's three-tier restrictions. See Mo. Rev. Stat. §§ 311.050, 311.060.1. Among other qualifications, an individual licensee must be a "qualified legal voter and a taxpaying citizen of the county, town, city or village," while a corporate licensee's "managing officer" must be a "qualified legal voter and taxpaying citizen of the county, town,

_____

[3]Unlike other States, Missouri's system includes a fourth tier, solicitors who act as brokers between producers and wholesalers. See Mo. Rev. Stat. § 311.275. This distinction does not affect the basic functioning of the tiered system and we do not address it further. See S. Wine, 799 F.3d at 805 n.3.

[4]See Utah Code Ann. §§ 32B-2-202, 204, 501, and 32B-7-202; Mich. Comp. Laws § 436.1231.

-4-

city or village." Mo. Rev. Stat. § 311.060.1. In addition, a licensed retailer must operate from physical premises in Missouri named in the license, see Mo. Rev. Stat. §§ 311.220.3, 311.240.3; and must purchase liquor exclusively from Missouri-licensed wholesalers, Mo. Rev. Stat. § 311.280.1.

In 2007, Missouri amended the Liquor Control Act to allow in-state and out-of-state wine producers to ship wine directly to Missouri consumers. See Mo. Rev. Stat. § 311.185. A later amendment -- a principal focus of Sarasota's broad challenge in this case -- allows licensed Missouri in-state retailers to ship wine and other alcoholic beverages directly to consumers, provided the sale is made in-person, online, or by phone at the retailer's licensed premises. See Mo. Rev. Stat. § 311.300.2; Mo. Div. of Alcohol & Tobacco Control, Guidelines for Retailers Who Want to Deliver Alcohol (2020), citing Mo. Rev. Stat. § 311.240.3 and Mo. Code Regs. Ann. tit. 11, § 70-2.140(11).[5]

Sarasota Wine Market is a Florida-licensed wine retailer doing business as Magnum Wine and Tastings in Sarasota, Florida. Sarasota Wine has received orders on its website for direct shipments to Missouri residents. It declines these sales because it is an out-of-state retailer with no physical presence in Missouri, and Missouri only permits direct wine shipments by licensed in-state retailers. Missouri residents Schlueter and French have attempted to order wines that Missouri retailers do not carry directly from out-of-state retailers like Sarasota Wine, but these retailers refuse to fulfill these orders because Missouri law prohibits direct shipments to Missouri consumers. Sarasota Wine and Cordes have not applied for a Missouri retailer license because they are not willing to open a physical store in Missouri and purchase wines sold to Missouri consumers from licensed Missouri wholesalers.

---

[5]https://atc.dps.mo.gov/IndustryCircular/guidelines-for-retailers-to-deliver-4-24-2 0.pdf (last visited Jan. 28, 2021).

Sarasota alleges the Chapter 311 restrictions on out-of-state retailers shipping wine directly to Missouri consumers, including the residency and physical presence license requirements, violate the Commerce Clause because they discriminate against interstate commerce and constitute protectionism of local businesses. In addition, Cordes individually alleges that Missouri's statutory scheme violates the Privileges and Immunities Clause because Cordes is a Florida resident being denied a retailer license needed to practice his trade as a wine merchant in Missouri. The Officials argue that these regulations are permissible components of a three-tiered system that the Supreme Court has blessed as "unquestionably legitimate" under Section 2 of the Twenty-first Amendment. Granholm, 544 U.S. at 488-89. In addition, they argue, Cordes's claim must fail because selling alcohol is not a fundamental right protected by the Privileges and Immunities Clause, and, in any event, the restrictions further legitimate, non-protectionist public interests.

The district court rejected the Officials' contention that the Sarasota plaintiffs lack standing. However, relying on our interpretation of the Supreme Court's decision in Granholm in Southern Wine, the court concluded there is no Commerce Clause violation because the challenged laws do not impermissibly discriminate against out-of-state *producers*, and Section 2 of the Twenty-first Amendment permits Missouri's restrictions on out-of-state *retailers*. The court rejected Cordes's individual licensee claim because the Privileges and Immunities Clause does not apply to the occupation of selling alcohol. Sarasota appeals, arguing *inter alia* that the district court's reliance on our interpretation of Granholm in Southern Wine was rejected in the Supreme Court's supervening decision in Tennessee Wine. In light of Tennessee Wine, Sarasota argues, we should reconsider the holding in Southern Wine, "issue a new opinion consistent with" Tennessee Wine, and remand with directions "to determine whether the Missouri residency rule being contested is constitutional under the new standard."

## II. Standing

The Officials moved to dismiss Sarasota's Amended Complaint for lack of standing as well as on the merits. The district court concluded the Sarasota plaintiffs adequately pleaded standing but dismissed their claims for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). On appeal, the Officials challenge each plaintiff's standing to assert Commerce Clause and Privileges and Immunities Clause claims. Article III standing is a threshold jurisdictional inquiry that we review *de novo*. See Jones v. Gale, 470 F.3d 1261, 1265 (8th Cir. 2006), cert. denied, 549 U.S. 1328 (2007). To establish standing, plaintiffs must show that they: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Kuhns v. Scottrade, Inc., 868 F.3d 711, 716 (8th Cir. 2017) (citation omitted). At the pleading stage, they can meet this burden with "general factual allegations" that satisfy these three elements. Wieland v. U.S. Dep't of Health & Hum. Servs., 793 F.3d 949, 954 (8th Cir. 2015) (citation omitted). We accept as true all factual allegations in the Amended Complaint and draw all reasonable inferences in favor of the nonmoving party. Id. at 953.

Though the district court logically focused on the injury-in-fact element of standing, the Officials argue on appeal that plaintiffs also failed to satisfy the traceability and redressability elements. "An injury is fairly traceable to a challenged statute when there is a causal connection between the two." Alexis Bailly Vineyard, Inc. v. Harrington, 931 F.3d 774, 779 (8th Cir. 2019) (quotation omitted). Redressability turns on whether a "favorable judicial decision" would remedy the alleged injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

To show injury in fact, plaintiffs must allege an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Id. at 560. In our view, this element does not require extended analysis. Sarasota alleges that

Sarasota Wine is prohibited from selling, delivering, or shipping wine from its out-of-state inventory to its Missouri customers because it is "not eligible for a Missouri off-premises [retail] license." Cordes, a Florida resident, alleges that he is unable "to practice his profession as a wine merchant in Missouri" because Missouri law prevents him from delivering out-of-state wines to Missouri customers who reside in Florida part of the year. As the Supreme Court said in Bacchus Imports, Ltd. v. Dias, "the [plaintiff liquor] wholesalers are surely entitled to litigate whether the discriminatory tax has had an adverse competitive impact on their business." 468 U.S. 263, 267 (1984); see Alexis Bailly Vineyard, 931 F.3d at 777-79.

Likewise, Schlueter and French have standing to challenge this aspect of the Missouri Liquor Control Act. Commerce Clause standing is not limited to the nonresident victims of discriminatory state laws. It extends to in-state customers who suffer economic injury, such as higher prices, caused by discriminatory laws. See General Motors Corp. v. Tracy, 519 U.S. 278, 286-87 (1997) (collecting cases); Bacchus Imps., 468 U.S. at 267. Schlueter and French allege that Missouri law prevents them from purchasing wines not available in Missouri retail stores; Sarasota Wine and other out-of-state retailers refuse to ship wine into Missouri because of Missouri's liquor laws, and Schlueter and French "cannot afford the time and expense of traveling to out-of-state retailers to purchase a few bottles of rare wine and personally transport them home." This is alleged economic injury, whatever one might think of the severity of the injury. See Freeman v. Corzine, 629 F.3d 146, 154-57 (3d Cir. 2010).

The Officials argue that Sarasota Wine and Cordes lack injury in fact because they never applied for Missouri retail liquor licenses they would be able to obtain.[6]

_____

[6]In this regard, the Officials note that out-of-state corporations such as Walmart and Total Wine have obtained retailer liquor licenses because the residency requirement only requires that the "managing officer" be a Missouri resident. Missouri regulations define managing officer to be "either an officer or an employee

But a Missouri retail liquor licensee must comply with conditions that Sarasota Wine and Cordes are unwilling to meet -- a licensee must operate a retail store in Missouri, Mo. Rev. Stat. §§ 311.220.3, 311.240.3, Mo. Code Regs. Ann. tit. 11, § 70-2.120; must be a resident individual licensee or have a resident corporate managing officer, Mo. Rev. Stat. § 311.060.1; and must purchase liquor exclusively from Missouri licensed wholesalers, Mo. Rev. Stat. § 311.280.1. Compliance with these conditions would frustrate the relief Sarasota seeks in this lawsuit -- the ability to ship wine purchased outside Missouri from their Florida inventories direct to Missouri consumers. Although the Officials argue this establishes lack of the redressability needed for Article III standing, we think it goes to the merits of Sarasota's broad-scale attack on the Missouri Liquor Control Act. Cf. Sporhase v. Neb. ex rel. Douglas, 458 U.S. 941, 944 n.2 (1982). We reject the Officials' argument that Sarasota challenges only the restriction on obtaining direct retailer shipping permits issued under § 311.060.1. The Amended Complaint expressly seeks a judgment "declaring Missouri's statutory scheme that prohibits out-of-state retailers from selling, delivering and shipping wine directly to a Missouri consumer, *including* Rev. Stat. Mo. § 311.060, unconstitutional" under the Commerce Clause. Plaintiffs have standing to challenge these laws under the Commerce Clause.

Though a closer question, we also conclude the allegations in the Amended Complaint are sufficient at this stage of the proceedings to show that Cordes as an individual plaintiff has standing to challenge these Missouri Liquor Control Act provisions under the Privileges and Immunities Clause. Natural persons, but not corporations, may invoke the protections of this Article IV provision. See W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 656 (1981). The same basic elements of standing apply to claims under this Clause. See Council of Ins. Agents & Brokers v. Molasky-Arman, 522 F.3d 925, 931 (9th Cir. 2008).

---

with the general control and superintendence." Mo. Code Regs. Ann. tit. 11, § 70-2.030(7).

The Officials argue that Cordes, who owns and operates Sarasota Wine, lacks standing to assert this claim because his alleged injury "flows directly and solely from the alleged injury to [Sarasota Wine], which is not constitutionally cognizable." Chance Mgmt., Inc. v. South Dakota, 97 F.3d 1107, 1116 (8th Cir. 1996) (quotation omitted). We disagree. The Amended Complaint alleges that Missouri's liquor laws, by preventing Cordes from completing wine sales to Missouri customers, damage his practice of a trade -- wine merchant and consultant. That distinguishes the Amended Complaint from the summary judgment record in Chance Management, where the corporate shareholder plaintiff did not allege denial of a personal economic interest arguably protected by the Privileges and Immunities Clause. See Molasky-Arman, 522 F.3d at 929, 932.

### III. Commerce Clause Claims

The Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States." The Supreme Court interprets this Clause as including a "dormant" limitation on the States' power to enact "laws that unduly restrict interstate commerce." Tenn. Wine, 139 S. Ct. at 2459 (collecting cases). "This negative aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." Id. (cleaned up).

Section 2 of the Twenty-first Amendment allows States to regulate the "transportation or importation . . . for delivery or use therein of intoxicating liquors." The Supreme Court initially interpreted Section 2 as conferring broad powers on the States to regulate alcohol within their borders, including laws and regulations discriminating against out-of-state alcohol interests that the dormant Commerce Clause would normally forbid. See Granholm, 544 U.S. at 485-86. But over time, the Court held in a series of cases that Section 2 does not authorize States to take actions that violate other constitutional provisions, such as the Free Speech Clause,

-10-

Equal Protection Clause, and -- relevant to this appeal -- the Commerce Clause.  Id. at 486-87 (collecting cases).

In two recent decisions, the Court recognized "that the three-tiered distribution system itself is 'unquestionably legitimate.'"  Granholm, 544 U.S. at 489, quoting North Dakota v. United States, 495 U.S. 423, 432 (1986) (plurality opinion), and citing id. at 447 (Scalia, J., concurring); see Tenn. Wine, 139 S. Ct. at 2471 ("At issue in the present case is not the basic three-tiered model of separating producers, wholesalers, and retailers, but the durational-residency requirement . . . impose[d] on new applicants for liquor store licenses.").  These cases also established that the ways in which a State implements its three-tiered system are not immune from dormant Commerce Clause scrutiny.  The question in a particular case is "whether the principles underlying the Twenty-first Amendment are sufficiently implicated . . . to outweigh the Commerce Clause principles that would be otherwise be offended."  Bacchus Imps., 468 U.S. at 275; see Granholm, 544 U.S. at 488.  Courts must take into account a State's valid interests in regulating alcohol, such as promoting responsible consumption, preventing underage drinking, and collecting taxes.  But economic protectionism "is not such an interest."  Tenn. Wine, 139 S. Ct. at 2469.

In Granholm, the Court held that Michigan and New York laws allowing in-state wine producers to ship directly to consumers while prohibiting or making impractical direct sales by out-of-state wineries violated the Commerce Clause.  Though the three-tiered system is "unquestionably legitimate," the Court concluded, this discrimination against out-of-state producers "is contrary to the Commerce Clause and is not saved by the Twenty-first Amendment."  544 U.S. at 489.  The States in Granholm failed to show that the discriminatory direct-shipping restrictions advanced a valid local purpose that could not be served by nondiscriminatory alternatives.  In these circumstances, "[i]f a State chooses to allow direct shipment of wine, it must do so on evenhanded terms."  Id. at 493.

In Southern Wine, a Florida corporation challenged the Missouri law requiring officers and directors of a licensed liquor wholesaler to be bona fide Missouri residents for at least three years. 731 F.3d at 802-03; see Mo. Rev. Stat. § 311.060.3. Interpreting Granholm, the most recent and explicit Supreme Court precedent, we noted that the state laws at issue in that case "worked to exempt in-state wineries -- but not their out-of-state competitors -- from distributing their wines through wholesalers." Id. at 806. By contrast, Missouri's three-year residency requirement for in-state wholesalers "does not discriminate against out-of-state liquor products or producers." Id. at 810. We observed that Granholm confirmed that it is "beyond question that States may require wholesalers to be 'in-state' without running afoul of the Commerce Clause," because in Granholm "the Court cited the 'in-state wholesaler' in connection with the very sentence affirming that 'the three-tier system itself is unquestionably legitimate.'" Id. Thus, "[i]nsofar as Granholm imported a balancing approach to regulations of the three-tier system . . . it drew a bright line between the producer tier and the rest of the system." Id. Moreover, we concluded, even if wholesaler restrictions do not enjoy "protected" status under Granholm, Missouri's three-year residency requirement "passes muster" under the Twenty-first Amendment because the Legislature "legitimately could believe" that the requirement serves valid health, safety, and regulatory interests. Id. at 810-11.

In Tennessee Wine, a trade association of in-state liquor stores challenged a Sixth Circuit decision striking down a two-year residency requirement for individuals and corporate officers seeking an in-state retailer license. The Supreme Court granted certiorari to address "disagreement among the Courts of Appeals about how to reconcile our modern Twenty-first Amendment and dormant Commerce Clause precedents." 139 S. Ct. at 2459. The Court first "reiterate[d] that the Commerce Clause by its own force restricts state protectionism," and that Section 2 of the Twenty-first Amendment "must be viewed as one part of a unified constitutional scheme." Id. at 2461-62. The Court then rejected the argument that the Commerce Clause nondiscrimination principle which it applied in Granholm to out-of-state

-12-

alcohol products and producers does not apply to "state laws that regulate in-state alcohol distribution." Id. at 2470-71. Rather, "[a]lthough Granholm spoke approvingly of [the basic three-tiered] model, it did not suggest that § 2 sanctions every discriminatory feature that a State may incorporate into its three-tiered scheme." Id. at 2471. Applying the Commerce Clause more broadly than some Courts of Appeals, the Court held that Section 2:

> allows each State leeway to enact the measures that its citizens believe are appropriate to address the public health and safety effects of alcohol use and to serve other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests.

Id. at 2474. Applying that standard, the Court concluded the two-year residency requirement "violates the Commerce Clause and is not saved by the Twenty-first Amendment" because its "predominant effect . . . is simply to protect the Association's members from out-of-state competition." Id. at 2476.

Without question, Tennessee Wine overruled one of the alternative grounds on which we upheld the three-year wholesaler residency requirement in Southern Wine when it held that the Commerce Clause prohibition of protectionist measures applies to all three tiers of a three-tiered system. Tennessee Wine did not explicitly overrule Southern Wine's alternative ground -- that Missouri's three-year residency requirement "passes muster" because it "serves valid health, safety, and regulatory interests." But the Court invalidated Tennessee's two-year durational residency requirement for individuals seeking initial *retail* licenses, concluding -- on a summary judgment record -- that it was an invalid "protectionist measure" because "the 2-year residency requirement [is] ill suited to promote responsible sales and consumption practices" and "there are obvious alternatives that better serve that goal without discriminating against nonresidents." 139 S. Ct. at 2474, 2476. In affirming the Sixth Circuit, see Byrd v. Tenn. Wine & Spirits Retailers Ass'n, 883 F.3d 608, 622-

-13-

23 (6th Cir. 2018), the Supreme Court cited favorably a prior Fifth Circuit decision invalidating durational residency requirements, Cooper v. McBeath, 11 F.3d 547 (5th Cir. 1994) (one and three year residency requirements to acquire a nightclub's "mixed beverage permit"). Tenn. Wine, 139 S. Ct. at 2475. In Southern Wine, we noted the nonresident applicant "did not raise this protectionist-intent argument in the district court." 731 F.3d at 807. Presumably, if a future out-of-state applicant for a Missouri in-state wholesaler license does make a properly supported claim of protectionism, Tennessee Wine will require a fresh look at the Twenty-first Amendment issue.

However, that conclusion does not resolve the Commerce Clause issue in this case, because Sarasota Wine and Cordes are not applicants for an in-state Missouri liquor license challenging a durational residency requirement. Rather, they challenge Missouri's requirements that licensed liquor retailers be residents of Missouri, have a physical presence in the State, and purchase liquor sold in the State from licensed in-state wholesalers. Under Sarasota's interpretation of the Commerce Clause, if Florida allowed Sarasota Wine to be acquired or controlled by one or more wine producers, Missouri would be compelled to permit alcohol sales and deliveries into Missouri by a twenty-first century version of the tied house.

The licensing requirements and restrictions at issue have been consistently upheld, before and after Granholm and Tennessee Wine, as essential to a three-tiered system that is "unquestionably legitimate." See Byrd, 883 F.3d at 623 ("requiring wholesaler or retailer businesses to be physically located within Tennessee may be an inherent aspect of a three-tier system"); Cooper v. Tex. Alcoholic Beverage Comm'n, 820 F.3d 730, 743 (5th Cir.) (distinctions between in-state and out-of-state retailers and wholesalers are permissible "if they are an inherent aspect of the three-tier system."), cert. denied sub nom., Tex. Package Stores Ass'n v. Fine Wine & Spirits of N. Tex., 137 S. Ct. 494 (2016); Wine Country Gift Baskets.com v. Steen, 612 F.3d 809, 818-20 (5th Cir. 2010) ("Because of Granholm and its approval of three-tier systems, we know that Texas may authorize its in-state, permit-holding

-14-

retailers to make sales and may prohibit out-of-state retailers from doing the same. . . . [D]iscrimination that would be questionable, then, is that which is not inherent in the three-tier system itself. . . . [A] beginning premise is that wholesalers and retailers may be required to be within the State."), cert. denied, 562 U.S. 1270 (2011); Arnold's Wines, 571 F.3d at 191 ("Requiring out-of-state liquor to pass through a licensed in-state wholesaler and retailer . . . mandates that both in-state and out-of-state liquor pass through the same three-tier system before ultimate delivery to the consumer."); Brooks v. Vassar, 462 F.3d 341, 352 (4th Cir. 2006) (challenging the requirement that out-of-state retailers sell through Virginia's three-tier system "is nothing different than an argument challenging the three tier system itself," which Granholm upheld as "unquestionably legitimate.").

In Lebamoff Ents. Inc. v. Whitmer, 956 F.3d 863 (6th Cir. 2020), cert. denied, 2021 U.S. LEXIS 414 (2021), the Sixth Circuit again took up these issues after the decision in Tennessee Wine affirming its durational residency decision in Byrd. This time, the court rejected a Commerce Clause challenge by an Indiana wine retailer and several Michigan wine consumers to an amendment of the Michigan Liquor Control Code allowing in-state retailers to deliver direct to consumers using licensed "facilitators" or common carriers. The court noted the Supreme Court in Granholm said that nothing stops the States from "funnel[ing] sales through the three-tier system" that is "unquestionably legitimate." Courts also have permitted States "to regulate wholesalers (the second tier) . . . to control the volume of alcohol sold in a State and the terms on which it is sold," and have "require[d] retailers to be physically based in the State." Id. at 869-70, citing Southern Wine and other cases. The court then framed the issue that is also presented in this case:

> All of this leaves a narrow question. If Michigan may have a three-tier system that requires all alcohol sales to run through its in-state wholesalers, and if it may require retailers to locate within the State, may it limit the delivery options created by the new law to in-state retailers? The answer is yes.

-15-

Id. at 870. After reviewing prior decisions such as Bridenbaugh, Arnold's Wines, and Steen, the court observed:

> there is nothing unusual about the three-tier system, about prohibiting direct deliveries from out of state to avoid it, or about allowing in-state retailers to deliver alcohol within the State. Opening up the State to direct deliveries from out-of-state retailers necessarily means opening it up to alcohol that passes through out-of-state wholesalers or for that matter no wholesaler at all. That . . . create[s] a sizeable hole in the three-tier system . . . . leav[ing] too much room for out-of-state retailers to undercut local prices and to escape the State's interests in limiting consumption. . . . That Michigan permits direct deliveries by in-state retailers . . . . is nothing new. . . . Anyone who wishes to join them can get a Michigan license and face the regulations that come with it.

Id. at 872-73. The court concluded that "[t]he purpose of the [three-tiered] system, for better or worse, is to make it harder to sell alcohol by requiring it to pass through regulated in-state wholesalers. . . . [This] seems far afield from the tied-saloon system that the three-tier system was designed to replace. . . . But the Twenty-first Amendment leaves these considerations to the people of Michigan, not to federal judges." Id. at 875.

We agree with the Sixth Circuit that Tennessee Wine does not require us to reverse and remand in this case. In Tennessee Wine, the Court invalidated a durational residency requirement that "is not an essential feature of a three-tiered scheme." 139 S. Ct. at 2471. The Court expressly distinguished between the two-year residency requirement at issue and a State's requirement that retail liquor stores be physically located within the State. See 139 S. Ct. at 2475. By contrast, Sarasota without question attacks core provisions of Missouri's three-tiered system that the Court again described as "unquestionably legitimate."

-16-

There are passages in the <u>Tennessee Wine</u> opinion that may forecast a future decision that retailer or wholesaler residency or physical presence requirements, or the mandate to purchase only from in-state wholesalers, are subject to an evidentiary weighing to determine "[h]ow much public health and safety benefit must there be to overcome this Court's worries about protectionism 'predominating.'" 139 S. Ct. at 2484 (Gorsuch, J., dissenting). These requirements are likely to impose greater costs than would otherwise be incurred by an out-of-state retailer selling to Missouri consumers. But Missouri imposes the same licensing requirements on in-state and out-of-state retailers. Viewed from this perspective, laws establishing a three-tiered distribution system may be economically and socially anachronistic, but they do not discriminate against out-of-state retailers and wholesalers. <u>See</u> <u>Bridenbaugh</u>, 227 F.3d at 853 ("*Every* use of § 2 could be called 'discriminatory' . . . because every statute limiting importation leaves intrastate commerce unaffected. If that were the sort of discrimination that lies outside state power, then § 2 would be a dead letter.").

The Missouri laws at issue in this case are an essential feature of its three-tiered scheme, and the rules governing direct shipments of wine to Missouri consumers apply evenhandedly to all who qualify for a Missouri retailers license. "States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." <u>United Bldg. & Constr. Trades Council v. Mayor & Council of Camden</u>, 465 U.S. 208, 223 (1984). Given that Section 2 of the Twenty-first Amendment is a *constitutional* command, the Supreme Court may ultimately decide that it "is ill suited to the judicial function" to conduct a rigorous Commerce Clause inquiry into whether a state law that comprises an *essential* element of its three-tiered distribution system is a protectionist measure with no demonstrable connection to valid Section 2 interests. <u>CTS Corp. v. Dynamics Corp. of Am.</u>, 481 U.S. 69, 95 (1987) (Scalia, J., concurring). We conclude we should be no more invasive of the "unquestionably legitimate" three-tiered system than the Supreme Court has mandated. Accordingly, we agree with the district court that Sarasota's Amended Complaint failed to state viable dormant Commerce Clause claims.

## IV. The Privileges and Immunities Clause Claim

Cordes argues that these Missouri liquor laws violate the Privileges and Immunities Clause, which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., art. IV, § 2, cl. 1. This Clause "protects the right of citizens to ply their trade, practice their occupation, or pursue a common calling," McBurney v. Young, 569 U.S. 221, 226 (2013), in another State "on terms of substantial equality with the citizens of that State." Sup. Ct. of N.H. v. Piper, 470 U.S. 274, 280 (1985). "There is scant precedent considering the interaction of the Privileges and Immunities Clause and the Twenty-first Amendment." Lebamoff Ents., Inc. v. Rauner, 909 F.3d 847, 857 (7th Cir. 2018). "[N]o prior case in this or any other circuit has found a state regulation of alcohol violated the Privileges and Immunities Clause." Whitmer, 956 F.3d at 876.

Like the Commerce Clause, the Privileges and Immunities Clause "was intended to create a national union." Piper, 470 U.S. at 280. "[T]he Clause does not require that a State tailor its every action to avoid any incidental effect on out-of-state tradesmen." McBurney, 569 U.S. at 229. Nor does the Clause "preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objectives." Piper, 470 U.S. at 284. "[T]the court has struck laws down as violating the privilege of pursuing a common calling only when those laws were enacted for the protectionist purpose of burdening out-of-state entities." McBurney, 569 U.S. at 227.

Viewed from this perspective, we think it apparent the district court properly dismissed Cordes's Privileges and Immunities Clause claim, regardless whether the trade or occupation of selling alcohol is a "fundamental" privilege. Selling alcohol to consumers is a lawful occupation in Missouri, provided the retailer obtains a license and complies with the applicable regulations. See Mo Rev. Stat. § 311.060.1.

Section 311.060.1 requires all licensees, residents and nonresidents alike, to become a Missouri voter and taxpayer, in other words reside in Missouri, to engage in the privilege of practicing that calling. Is that "discrimination" against nonresidents, or simply an "incidental effect" of regulatory requirements? As the Sixth Circuit noted in Whitmer, "[t]o sell alcohol in Michigan, [Indiana retailers] simply have to play by the Michigan rules -- just as they have to do in Indiana." 956 F.3d at 876. It is not impossible for Cordes to obtain an individual Missouri retailer license, but to be eligible, he must move to Missouri, which he will not do. Nor is he willing to form a personal LLC, establish a physical presence in Missouri with a resident "managing officer," and obtain a retailers license in the name of that company.

Even if Missouri does "discriminate" against nonresidents by requiring liquor licensees to reside in Missouri, such discrimination is permissible if it is not protectionist, that is, if there is a substantial reason for the economic burden the license requirements place on nonresidents, and the burden bears a substantial relationship to the State's legitimate objectives. Here, as we explained in Part III, the licensing restrictions that Cordes is unwilling to meet are essential to Missouri's implementation of its authority under Section 2 of the Twenty-first Amendment -- a three-tiered system for regulating the "transportation or importation" of intoxicating liquors "for delivery or use" in the State. Until the Supreme Court concludes that essential elements of the three-tiered system are not protected from dormant Commerce Clause challenge, an individual nonresident's challenge under the Privileges and Immunities Clause likewise fails to state a claim.

## V. Conclusion

As our Seventh Circuit colleague David Hamilton has observed, "the three-tier distribution system [is] a model that may seem to have less and less value as the internet and e-commerce flatten the global marketplace. Yet the extraordinary constitutional status given to state alcoholic beverage laws in the Twenty-first

-19-

Amendment was the compromise that allowed the repeal of Prohibition." <u>Lebamoff Ents., Inc. v. Huskey</u>, 666 F.3d 455, 472 (7th Cir. 2012) (Hamilton, J., concurring). We agree with the Sixth Circuit that the Supreme Court in <u>Granholm</u> and <u>Tennessee Wine</u> did not decide that essential elements of the three-tiered system are subject to frontal attack under the dormant Commerce Clause or the Privileges and Immunities Clause. Therefore, those seeking a more consumer-oriented organization of alcohol industries must "turn to state-by-state political action on behalf of consumers who are hurt by these laws." <u>Id.</u>

 The judgment of the district court is affirmed.

_____